Oleksandra Byelyakova, Esq.
Olivia Kaplan, Esq.*
**LEGAL SERVICES OF NEW JERSEY**
100 Metroplex Drive, Suite 101
Edison, New Jersey 08817
okaplan@lsnj.org
(732) 572-9100 ext. 8323

*Attorneys for Petitioner*
*\*pending admission*

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Tulio Rafael MENA,<br><br>                              Petitioner,<br><br>        v.<br><br>Joseph E. FREDEN , in his official capacity as Deputy Field Office Director and Administrator of the Buffalo Federal Detention Facility; Thomas BROPHY, in his official capacity as Buffalo Field Office Director for U.S. Immigration and Customs Enforcement; Patrick LECHLEITNER, in his official capacity as Director of U.S. Immigration and Customs Enforcement; Alejandro MAYORKAS, in his official capacity as Secretary of the U.S. Department of Homeland Security; Merrick GARLAND, in his official capacity as Attorney General of the United States,<br><br>                              Respondents. | Case No. 1:25-cv-49<br><br><br>**VERIFIED PETITION FOR WRIT OF HABEAS CORPUS** |

## PETITION FOR A WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2241

Petitioner respectfully petitions this Honorable Court for a writ of habeas corpus to remedy Petitioner's unlawful detention by Respondents, as follows:

### INTRODUCTION

1.      Petitioner Tulio Rafael Mena is a citizen of the Dominican Republic. He had been living in the United States as a lawful permanent resident for many years until the Department of Homeland Security initiated the proceedings to strip him of his status and remove to his native country. He is currently in the custody of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE") at the Buffalo Federal Detention Facility ("BFDF") in Batavia, New York. Mr. Mena was determined to be subject to mandatory detention pursuant to 8 U.S.C. §1226(c) due to his criminal conviction.

2.      Mr. Mena brings this petition to challenge his almost yearlong civil detention without an individualized bond hearing to determine whether it is necessary.

3.      Mr. Mena came to the United States as a lawful permanent resident in September 1980, when he was only three years old. His mother is a citizen of the United States, as was his late father. On July 17, 2009, he was convicted of robbery in New Jersey, for which Mr. Mena was incarcerated for 15 years in East Jersey State Prison. This conviction arose from conduct that occurred in 1995 when Mr. Mena was 18 years old. On February 16, 2024, at age 47, he was released from state custody and detained by immigration officials.

4.       Mr. Mena was ordered removed on June 17, 2024 when an Immigration Judge (IJ) found that his 1995 offense was an aggravated felony, thereby making him deportable and rendering him ineligible for Cancellation of Removal of Permanent Residents. The Board of

Immigration Appeals (BIA) upheld the IJ's decision on December 13, 2024. Mr. Mena is currently appealing the BIA's decision to the Second Circuit Court of Appeals.

5.      To date, Mr. Mena has not received a hearing conducted by a neutral decision maker, a federal judge or an immigration judge, to determine whether this lengthy incarceration is warranted based on danger or flight risk. For the reasons explained further below, Mr. Mena's ongoing prolonged detention without a hearing to assess danger and flight risk violates the Due Process Clause of the Fifth Amendment.

6.      Courts have broad power to fashion equitable remedies to address constitutional violations in prisons. *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978). Mr. Mena submits that his immediate release is appropriate to remedy a violation of his constitutional rights. In that alternative, he requests that this Court, pursuant to *Black v. Decker*, hold or order a bond hearing at which the Government (i) bear the burden of proof by clear and convincing evidence as to the necessity of continued detention, and (ii) show that no alternatives to detention are available. 103 F.4th 133 (2d Cir. 2024).

## **PARTIES**

7.      Petitioner Tulio Rafael Mena is a noncitizen currently detained by Respondents at BFDF pending the outcome of the judicial review of the BIA's decision affirming the removal order and any further removal proceedings.

8.      Respondent Joseph E. Freden is named in his official capacity as Deputy Field Office Director and Administrator of the Buffalo Federal Detention Facility, where Petitioner is currently detained. He is Petitioner's immediate physical custodian.

9.      Respondent Thomas Brophy is named in his official capacity as the Director of the Buffalo Field Office of ICE Enforcement and Removal Operations (ERO). In this capacity,

3

Respondent Brophy is responsible for administration and management of ICE Enforcement and Removal Operations in New York and exercises ultimate control over where Petitioner is detained and the BFDF. He is a legal custodian of Petitioner.

10.  Respondent Patrick Lechleitner is named in his official capacity as Acting Director of ICE. In this capacity, Respondent Lechleitner is responsible for the administration of federal immigration law and the execution of detention and removal determinations; he routinely transacts business in the Western District of New York, and, he is a legal custodian of Petitioner.

11.  Respondent Alejandro Mayorkas is named in his official capacity as the Secretary of the U.S. Department of Homeland Security. In this capacity, he is responsible for the administration of federal immigration law pursuant to 8 U.S.C. § 1103(a); he routinely transacts business in the Western District of New York; and he is legally responsible for pursuing Petitioner's detention and removal. As such, he is a legal custodian of Petitioner.

12.  Respondent Merrick Garland is named in his official capacity as Attorney General of the United States. In this capacity, he is responsible for the administration of federal immigration law, directly and by delegation to the Executive Office for Immigration Review (EOIR), pursuant to 8 U.S.C. § 1103(g). He routinely transacts business in the Western District of New York and is legally responsible for adjudicating Petitioner's removal and custody-redetermination proceedings and for determining the standards and jurisdictional limitations in those proceedings. As such, he is a legal custodian of Petitioner.

## JURISDICTION AND VENUE

13.  This action arises under the Fifth and Fourteenth Amendments to the U.S. Constitution.

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 2241, Art. I § 9, cl. 2 of the United States Constitution, 28 U.S.C. § 1331, and 28 U.S.C. § 1361. This Court may grant relief under the habeas corpus statutes, 28 U.S.C. § 2241 et seq., the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., and the All Writs Act, 28 U.S.C. § 1651.

15.     The United States has waived sovereign immunity for this action for declaratory and injunctive relief against its agencies' officers, who are sued in their official capacities. *See* 5 U.S.C. § 702.

16.     Venue is proper in this District under 28 U.S.C. § 1391 because Petitioner is detained in this District.

**Administrative Exhaustion is Not Required.**

17.     Mr. Mena has not filed a bond motion before the IJ. In the present case, exhaustion of administrative remedies is not required for jurisdiction to lie before this Court.

18.     28 U.S.C. § 2241 does not require exhaustion.  While courts have generally required exhaustion as a "prudential matter," exceptions apply. *Michalski v. Decker,* 279 F. Supp. 3d 487, 495 (S.D.N.Y. 2018). Under Second Circuit law, exceptions to judicial exhaustion exist where:

> (1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question.

*Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003)

19.     In the present case, requiring exhaustion would be futile because the IJ has already found him ineligible for bond. Further, Mr. Mena raises a substantial question about the constitutionality of his detention.  Neither the IJ nor the BIA may rule on such issues. *In Re Rodriguez-Carrillo,* 22 I. & N. Dec. 1031, 1035 (BIA 1999) ("[N]either the Immigration Judge nor this Board may rule on the constitutionality of the statutes that we administer."); *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 238 (W.D.N.Y. 2019) (finding that exceptions to prudential

exhaustion for the futility of an administrative appeal and a substantial constitutional question applied to habeas petitioner's motion to enforce requirements of the Due Process Clause).

## STATEMENT OF FACTS

### I.      Petitioner's Background and family ties in the United States.

20.      Petitioner Tulio Rafael Mena has lived in the United States for forty-four years, since he was three years old. *See* Exhs. A, C. He was born in the Dominican Republic and was admitted to the United States as a lawful permanent resident on September 28, 1980. Exh. B. Mr. Mena has no memory of the Dominican Republic, and has never known another country. Exh. A. His mother is a US citizen, as was his late father. Exhs. D, E. His parents entered the U.S. in 1980 and built their lives and their family in the United States. Exh A, B.

21.      Mr. Mena has deep roots in the United States through his large and loving family: his mother, three siblings, aunts, nieces, nephews, and cousins, who live in New York City. He has cousins and nephews in New York, New Jersey, and California. All of these family members are United States citizens or lawful permanent residents with whom he maintains close ties, and who regularly visited him in East Jersey State Prison. Exh. A. A large number of family members also joined Mr. Mena's removal hearings in support.

22.      On July 17, 2009 in Bergen County, New Jersey, Mr. Mena was sentenced to 15 years incarceration for two counts of N.J.S.A. 2C:15-1, Robbery, to run concurrently. This conviction arose in connection with charges in Bergen County, New Jersey from July 19, 1995, when Mr. Mena was an 18-year old student at Lehman College in Bronx, New York.

**Mr. Mena's removal proceedings begin; detention is extended by DHS' delay.**

23.      ICE apprehended Mr. Mena at the East Jersey State Prison on February 16, 2024 upon completion of his criminal sentence and transferred him to the Elizabeth Contract Detention

6

Facility (EDCF). A Notice to Appear (NTA) was filled with the court, and Mr. Mena's first hearing at the Elizabeth Immigration Court in Elizabeth, New Jersey, was scheduled for February 27, 2024. Exh. F. At that time, Mr. Mena requested a Joseph hearing to review the mandatory detention designation. On February 21, 2024, ICE informed the Elizabeth IC that they had transferred Mr. Mena to Batavia, without indicating when. Exh. G.[1]

24. The same day, DHS moved for a change of venue from Elizabeth Immigration Court to Batavia Immigration Court. Exh H. The motion was granted before the end of the day, with the Elizabeth Immigration Judge finding the requirements of 8 CFR 1003.20(b) were met, including that the other party be given notice and an opportunity to respond. 8 CFR 1003.20(b); *See* Exh. H. However, Mr. Mena was not afforded the opportunity to respond. Exh. A.

25. Mr. Mena's first appearance in immigration court occurred on March 11, 2024, twenty-four days after being detained. He appeared by televideo before Immigration Judge Robert Driscoll at the Batavia Immigration Court *pro se*. Mr. Mena's removal and bond hearings were held in a group with two other detainees. The IJ asked the three detainees if they would be requesting bond. Mr. Mena responded that he needed counsel prior to requesting bond. The IJ entered an order indicating that Mr. Mena had withdrawn his custody redetermination request without prejudice.

26. Although Mr. Mena had previously secured *pro bono* counsel through Legal Services of New Jersey (LSNJ) under the premise that his case would be heard by the Elizabeth Immigration Court, the transfer of his case to the Batavia Immigration Court resulted in him having to seek local pro bono counsel in Batavia. Exh A. At his first individualized master calendar

---

[1] Under 8 CFR 1003.19(g), DHS is required to immediately inform the immigration court having jurisdiction over proceedings when they have transferred a detainee in their custody to another facility, and state the effective date of the change in custody location. The notice does not state the date of transfer.

hearing on April 1, 2024, Mr. Mena requested a continuance through local pro bono counsel Volunteer Lawyer's Project ("VLP") for attorney preparation. However, due to Mr. Mena's extensive records and VLP's lack of familiarity with Mr. Mena's case, LSNJ moved to substitute as counsel prior to Mr. Mena's April 22, 2024 master calendar hearing.

27.    On April 22, 2024, Mr. Mena through counsel initially denied his charge of removability under 8 U.S.C. § 1227(a)(2)(A)(iii) on the basis that his New Jersey conviction was not a categorical match under 8 U.S.C. § 1101(a)(43)(G), an aggravated felony theft offense.  DHS filed Form I-261 to add a charge of removability under 8 U.S.C. § 1101(a)(43)(F), that the New Jersey conviction was a crime of violence, which was admitted to the record. Respondent's through his counsel also denied that charge. Briefing was requested by parties as to both charges.

28.    On June 17, 2024, the IJ denied Mr. Mena's motion to terminate the charges, sustaining Mr. Mena's charge of removability under 8 U.S.C. § 1227(a)(2)(A)(iii) as it applied to 8 U.S.C. § 1101(a)(43)(G) based on an aggravated felony theft offense and ordering Mr. Mena removed from the United States. No decision was made on Mr. Mena's aggravated felony charge under 8 U.S.C. § 1101(a)(43)(F) for a crime of violence. Exh. I at 8.

29.    Mr. Mena timely appealed the IJ's decision to the Board of Immigration Appeals (BIA), and filed his appellate brief on September 24, 2024, arguing that the IJ committed legal error by not making a finding as to the subsection of Mr. Mena's conviction, by finding that DHS had not met its burden of proof without providing proof of jury findings, by not properly applying the categorical approach, and by misstating the elements of New Jersey Robbery under N.J.S.A. § 2C:15-1.

30.    On December 13, 2024, the BIA dismissed Mr. Mena's appeal, adopting the IJ's analysis without discussion of Mr. Mena's extensive legal arguments. Exh. J.

8

31.    On December 20, 2024, Petitioner filed a petition for review of the BIA's December 13, 2024 decision, accompanied by a motion to proceed in forma pauperis with the Second Circuit Court of Appeals. Exh. K. He simultaneously requested a stay of removal pending the adjudication of his petition and is thus subject to the forbearance policy preventing removal while a petition for review and stay motion are both pending in the Second Circuit. *Efstathiadis v. Holder*, 752 F.3d 591, 599 n.5 (2d Cir. 2014) (per curiam). On December 30, 2024, Office of Immigration Litigation ("OIL") filed a motion opposing Petitioner's Motion to Stay Removal.

**Petitioner's Custody Proceedings and the conditions of his detention.**

32.    Mr. Mena has remained in the custody of Immigration and Customs Enforcement in Batavia throughout his proceedings. He has been detained for over ten months without an individualized bond hearing. Mr. Mena is detained pursuant to 8 U.S.C. § 1226(c), which mandates the detention of non-citizens accused of certain offenses. The IJ upheld Mr. Mena's mandatory detention designation based on a finding that his conviction constituted an aggravated felony theft offense (see 8 U.S.C. § 1227 (a)(2)(A)(iii) as related to 8 U.S.C. 1101(a)(43)(G)). Exh. I at 8. Therefore, the IJ has never considered whether Mr. Mena's continued detention was justified due to a risk of danger or flight.

**Conditions of Confinement: More Punitive than a Maximum Security State Prison.**

33.    Buffalo Federal Detention Facility (BFDF) is a private immigration detention facility. The conditions at BFDF put more restrictions on Petitioner's liberty than criminal custody in the maximum security facility at East Jersey State Prison. Exh A. At BFDF, in Unit A-1 where Mr. Mena is housed, detainees are confined to their cells for up to 18 hours a day, every day. Exhs. A, A-1, *and see* Exh. L. BFDF's Unit A-1 is so restrictive that it is also used as special housing unit (SHU) overflow, or disciplinary housing. Exh. A.

9

34.     The few hours Mr. Mena is permitted outside his cell constitutes all his time to eat, shower, meet with counsel, call loved ones, attend medical appointments, use the library, and have recreation. Exh. A.  Time in the library or meeting with counsel is deducted from one's time out of the cell. *Id.* In this way ICE violates its own detention standards: "[d]etainees shall not be required to forego recreation time to use the law library." PBNDS 2011, Rev, 2016. Chapter 6.3(II) pp. 421, para 5.[2]

35.     BFDF is notorious for its lack of access to physical and mental health treatment and retaliatory use of solitary confinement.[3] In June 2024, Mr. Mena was subject to further punitive treatment when ICE officers and BFDF staff sought to end a hunger strike with violence and retaliatory solitary confinement. *See* Exh L. at 6, 9. While Mr. Mena did not participate in the hunger strike, nonetheless, ICE officers threatened to lock down the unit if other detainees continued the hunger strike (24 hour confinement). Exh. A.

36.     Attorney video visits are only permitted for one hour as a matter of BFDF policy. Exh. L. Counsel has raised this issue with the Duty Officer at ICE and has been told that only one-hour virtual appointments are *ever* available at Batavia, while ICE regulations state that two hour counsel appointments are available subject to availability. *Id.* Again, this time to speak with counsel is deducted from recreational time. Exh. A. Officers and the law library cannot receive legal documents, it can take up to two weeks for a client to receive a document when sending or receiving mail to the facility.

37.     After being detained for over ten months at BFDF, Mr. Mena has never been informed of his housing classification. ICE has never conducted or provided a housing

---

[2] Detention Standards Available from ICE: https://www.ice.gov/doclib/detention-standards/2011/6-3.pdf
[3] Geoff Kelly, *Allegations of ICE Mistreatment of Detainees*, Investigative Post (Apr. 5, 2022), *available at* https://www.investigativepost.org/2022/04/05/allegations-of-ice-mistreatment-of-detainees/.

classification review.  Mr. Mena and counsel have requested the housing classification file but ICE has declined to provide it. Mr. Mena notes the comparison to state prison, in which the classification system is done annually before an adjudicative panel, based on a point system. Exh. A. In the prison system, the facility cannot be deprived of a privilege without an infraction flowing from the individual's conduct.  In ICE custody privileges are arbitrarily taken away. *Id.*

38.    Since Mr. Mena's family lives nine-hours' drive away in New York City, they have been unable to visit him and he is only able to communicate with them through expensive phones calls. Exh. C, and see Exh. L. There are 73-75 detainees on the A-1 housing unit, and 10 tablets allocated to them, but only 3 are in working order. Exh. A. The tablets are the means through which one can communicate via video with family.  As such, both phone and video access to loved ones is much more restricted at BFDF than in prison.  The tablets version of LexisNexis is up-to-date, but the LexisNexis in the library is outdated by at least 10 months. Exh. A.

## II    Legal Framework.

39.    Section 1226 of Title 8 of the U.S. code provides for detention of noncitizens during the pendency of their removal proceedings. Section 1226 also governs the detention of noncitizens, like Mr. Mena, when removal is stayed by a circuit court of appeals during the pendency of the petition for review. *Hechavarria v. Sessions*, 891 F.3d 49, 57 (2d Cir. 2018). Section 1226(a) entitles most noncitizens to a hearing before an Immigration Judge to determine whether they should be released on bond. 8 U.S.C. § 1226(a); 8 C.F.R. § 1236.1(d). Noncitizens like Petitioner who are removable by virtue of certain criminal convictions are not entitled to a bond hearing, pursuant to § 1226(c). 8 U.S.C. § 1226(c); *Jennings v. Rodriguez*, 138 S. Ct. 830, 847 (2018).

40.    This Court must follow its precedent and consider Mr. Mena detained pursuant to 8 U.S.C. § 1226(c) and not 8 U.S.C. § 1231. This Court has repeatedly held that the "Forbearance

Agreement" between the Attorney General and the Second Circuit operates as a "court-ordered stay." *Kamara v. Garland*, No. 24-CV-743-LJV, 2024 WL 4470868, n.5 (W.D.N.Y. Oct. 11, 2024). Those with petitions for review pending before the Second Circuit and who have moved for a stay of their removal are deemed to be detained under 8 U.S.C. § 1226, rather than 8 U.S.C. § 1231. *See, e.g.*, *Hemans v. Searls*, 2019 WL 955353, at 3 (W.D.N.Y. Feb. 27, 2019); *and also Luna-Aponte v. Holder*, 743 F. Supp. 2d 189, 191 (W.D.N.Y. 2010).

41.    The Due Process Clause of the Fifth Amendment forbids the government from depriving any "person" of liberty "without due process of law." U.S. Const. amend. V. "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). Due process requires "adequate procedural protections" to ensure that the Government's asserted justification for physical confinement "outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (internal quotation marks omitted).

42.    Mr. Mena alleges that his continuous detention violates his Constitutional right to procedural due process because he has been subjected to unreasonably prolonged detention. The Second Circuit recently decided *Black v. Decker*, holding that due process barred the government from detaining noncitizens without a bond hearing for an unreasonably prolonged period under Section 1226(c), and that due process challenges to prolonged detention should be reviewed on a case by case basis. 103 F.4th 133, 138, 145 (2d Cir. 2024).

43.    To determine whether an unreasonably prolonged immigration detention violates procedural due process, *Black* applies the *Mathews v. Eldridge* balancing test and weighs (1) the private liberty interest at stake, (2) the risk of erroneous deprivation and the probable value of

additional safeguards, and (3) the Government's interest. *Black*, 103 F.4th at 148; *Matthews v. Eldridge,* 424 U.S. 319, 335 (1976).

44.    When immigration detention becomes prolonged, a noncitizen is entitled to a bond hearing at which the Government is required to prove that continued detention is necessary by clear and convincing evidence. *Black*, 103 F.4 at 157. Placing the burden of proof on the government "serves to allocate the risk of error between the litigants" and reduce the likelihood of an erroneous deprivation of liberty. *Addington v. Texas*, 441 U.S. 418, 423 (1979); *Velasco Lopez*, 978 F.3d at 856; *German Santos v. Warden Pike C'ty Corr. Facility*, 965 F.3d 203, 213 (3d Cir. 2020). "The clear-and-convincing burden of proof requires the government to prove that a factual contention is highly probable." *Apollinaire v. Barr*, No. 19-cv-6285, 2019 WL 4023560, at *3 (W.D.N.Y. Aug. 27, 2019); *see also U.S. v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985) ("[T]o find danger to the community under this standard of proof requires that the evidence support such a conclusion with a high degree of certainty."). District courts have found that the clear and convincing evidentiary standard requires a probability of 70 to 80%. *United States v. Copeland*, 369 F. Supp. 2d 275, 287 (E.D.N.Y. 2005).

## FIRST CLAIM FOR RELIEF

### Violation of Fifth and Fourteenth Amendment Right to Procedural Due Process: Unreasonably Long Detention Without a Bond Hearing.

Petitioner re-alleges and incorporates the following by reference:

45.    The Due Process Clause of the Fifth Amendment forbids the government from depriving any "person" of liberty "without due process of law." U.S. Const. amend. V. The *Mathews v. Eldridge* balancing test applies to determine whether Mr. Mena's ongoing incarceration poses due process concerns and whether additional procedural protections are necessary. *See Black*, 103 F.4th at 151-152 (citing *Mathews*, 424 U.S. at 335). The *Mathews*

balancing factors, as applied to the facts of this case, show that Mr. Mena's detention without a bond hearing has become unconstitutional. Mr. Mena is now entitled to an individualized bond hearing to determine whether his continued detention is justified.

## I. The Private Interest at Stake Favors a Bond Hearing Because Mr. Mena's Detention has Become Unreasonably Prolonged and is therefore Unconstitutional.

46.    The first factor in the *Matthews* balancing test, "the private interest affected by the official action[,] is the most significant liberty there is—the interest in being free from imprisonment." *Black*, 104 F.4th at 151 (internal citations omitted). Furthermore, "[t]he private interest here is not liberty in the abstract, but liberty *in the United States*." *Kamara*, No. 24-CV-743-LJV, 2024 WL 4470868, at 3 (quoting *Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999)).

47.    While any period of immigration detention constitutes a substantial deprivation of liberty, consideration of the factors that courts in this Circuit typically assess in prolonged mandatory detention claims shows that the liberty interest at stake in Mr. Mena's case is particularly weighty.

48.    Mr. Mena has demonstrated the strength of his interest in his liberty in the United States by subjecting himself to ten months in the conditions akin to solitary confinement in ICE custody. *See, e.g.*, *Fremont v. Barr*, 2019 WL 1471006, at *6 n.7 (W.D.N.Y. Apr. 3, 2019) (Vilardo, J.) ("[N]o rational person would subject himself or herself to unreasonably prolonged detention in a jail-like detention facility unless that person's liberty interests in remaining in the United States are quite strong."); *Akinsanya v. Brophy*, No. 24-CV-732-LJV, 2024 WL 4471082, at *3 (W.D.N.Y. Oct. 11, 2024.) Mr. Mena's demonstration of the will to be free from restraint in the United States is a private interest factor weighing heavily in his favor.

49.    In *Black*, the Second Circuit held that even a "seven-month-long" detention absent procedural protections was a "serious[] infringe[ment]" of liberty. *Black* 103 F.4th at 151.

14

50.     Mr. Mena has been detained over ten months without procedural protections, longer than the seven months that *Black* held raises serious due process concerns. Courts in this Circuit "have generally been skeptical of prolonged detention of removable immigrants, without process, lasting over six months," *Concepcion v. Barr*, 514 F. Supp. 3d 555, 564 (W.D.N.Y. 2021). Courts have regularly granted relief to petitioners detained under § 1226(c) for the same or shorter periods. *Kamara v. Garland*, No. 24-CV-743-LJV, 2024 WL 4470868, at *3 (W.D.N.Y. Oct. 11, 2024) (ten months); *Cabral v. Decker*, 331 F. Supp. 3d 255, 261 (S.D.N.Y. 2018) (seven months).

51.     In *Kamara*, where the Petitioner stated he was detained for "more than eight months", or about ten months at the time his petition was considered, the Court found that due process demanded he receive a bond hearing. *See Kamara,* No. 24-CV-743-LJV, 2024 WL 4470868, at *3. Petitioner's detention in this case is of the same duration.

52.     Moreover, EOIR and the DHS are responsible for contributing to delay in Mr. Mena's proceedings contributing to unreasonably prolonged detention. Mr. Mena's master calendar hearing (not in a group setting) was moved from February 27 to April 1 when ICE transferred him to Batavia, New York. This transfer occurred without notice or opportunity to respond to the change of venue, and created further confusion and delay in his ability to procure pro bono counsel. Had the NTA that correctly stated the date, time, and jurisdiction of his hearing, Respondent would not have had to waste months in detention with continuances of March 11, and April 1 as he contended with which jurisdiction's legal service providers could represent him. The Court required several adjournments thereafter. Exhs. A, H.

53.     Here, DHS's transfer and EOIR's confusion with the scheduling caused Mr. Mena to remain in detention approximately two additional months. "Courts should keep in mind that aliens should not be punished for pursuing avenues of relief and appeals, but evidence of bad faith

delays may cut against them." *Constant v. Barr*, 409 F. Supp. 3d 159, 169 (W.D.N.Y. 2019) While Mr. Mena requested a continuance to find counsel and for attorney preparation at his initial master calendar hearings, there is no evidence he has engaged in bad faith delay tactics.

54.    Mr. Mena contests removability and has raised meritorious claims on appeal.  Mr. Mena moved to terminate the proceedings on the basis that the New Jersey robbery statute is not a categorical match to INA 101(a)(43)(G), an aggravated theft offense, as it includes more conduct not enumerated in the Act. See *Matter of Garcia-Madruga,* 24 I&N Dec. 436, 438-440 (BIA 2008);*see also Matter of Ibarra*, 26 I. & N. Dec. 809 (B.I.A. 2016); *Ya Yi Zeng v. Barr*, 828 F. App'x. 27 (2d Cir. 2020).[4]  In his appeal, Mr. Mena argues *inter alia* DHS failed to meet the burden of clear and convincing evidence for removability. The U.S. Supreme Court opined that establishing which subsection of a divisible statute a respondent was convicted of is essential to a party's duty to meet its burden of proof.

55.    Because Mr. Mena's case is currently before the Second Circuit Court of Appeals, the likelihood of continued detention further increases the weight of Mr. Mena's private interest in his liberty.  *See Concepcion,* 514 F. Supp. 3d at 565; *Cabral,* 331 F. Supp. 3d at 261. The likelihood of continued detention favors a grant of a new bond hearing. See *Concepcion*, 514 F. Supp. 3d at 565; *Cabral v. Decker*, 331 F. Supp. 3d 255 (S.D.N.Y. 2018).

56.    Mr. Mena is detained at BFDF, a "detention facility that severely curtails the liberties of the individuals detained therein." *Barrera Zuniga v. Garland*, No. 6:21-CV-06243

---

[4] "When the Government alleges that a state conviction qualifies as an 'aggravated felony' under the INA," courts apply the so-called "'categorical approach' to determine whether the state offense is comparable to an offense listed in the INA." *Moncrieffe v. Holder*, 569 U.S. 184, 190 (2013). Under the categorical approach, a conviction qualifies as an aggravated felony only if "the state statute defining the crime of conviction' categorically fits within the 'generic' federal definition of a corresponding aggravated felony." *Id.* "[A] state offense is a categorical match with a generic federal offense only if a conviction of the state offense *necessarily* involve[s] facts equating to the generic federal offense." *Id.* (alterations and quotation marks omitted; emphasis added).

EAW, 2021 WL 5989779, at *5 (W.D.N.Y. Dec. 16, 2021). Mr. Mena is confined in a cell up to18 hours per day. Exh. A. BFDF's A-1 Unit is similar to that which courts have found characterizes solitary confinement for prisoners in criminal custody.

57.    A facility's housing of prisoners in a constantly lit cell, even if dimmed, is one of four criteria by which one court determined that a prisoner in criminal custody is subject to solitary confinement. *Reynolds v. Arnone*, 402 F. Supp. 3d 3, 26 (D. Conn. 2019), *aff'd in part, vacated in part, remanded sub nom. Reynolds v. Quiros*, 990 F.3d 286 (2d Cir. 2021). The constantly lit cell contrasts with that of the maximum security state prison, at which Mr. Mena was able to turn the light off and sleep in the relative dark. Exhs. A; A-1. As Mr. Mena describes in his declaration, at BDFD he is subject to constant light, which is disorienting and does not permit adequate sleep. Exh A.

58.    Aside from the 18-hour "lock-in" period, BFDF custody is markedly similar to solitary confinement, such as the 18 hour a-day period "locked-in" and the limitation on contact visits, for an indeterminate future. The Supreme Court has found that deprivation of human contact is an extreme form of isolation. The practice of "double-celling", or placing two individuals in the segregation cell, does not ameliorate the issue. Deprivation of human contact is imposed at BFDF by prohibition on contact visits, to deprive detainees of the comfort and support of the loved ones who inspire them to continue fighting to remain close to them in the U.S. These deprivations weigh in favor of release.

59.    Mr. Mena's detention creates unnecessary hardship on his United States citizen family, particularly his mother, of 78 years. She is a widow and the primary caregiver for Mr. Mena's sister who is 59 and a grandson, both of whom are blind. All require assistance with the necessities of life such as carrying groceries up to their apartment. Mr. Mena's mother is still

working full-time to make ends meet**.** Exh**.** C. Mr. Mena's detention causes serious economic hardship to his family as his elderly mother struggles to maintain a full-time job and act as primary caregiver for two disabled family members. Mrs. Menieur de Mena writes of the punitive nature of ICE custody in Buffalo, sending him far away from the family, and that family does not have extra money for hotels and flights to Buffalo. *Id.* She implores this Court to allow him home as she needs his help with basic tasks, and his return is essential for her health, well-being, and stability. Exh. C.

60.     In sum, assessment of the traditional factors for consideration of claims of prolonged detention under § 1226(c) shows that the deprivation of liberty at stake, after over ten months, is extraordinarily weighty.

## II. The Second Mathews Factor, the Erroneous Risk of Deprivation to Mr. Mena by Denying him a Bond Hearing, weighs in Mr. Mena's Favor.

61.     The second *Mathews* factor - the risk of erroneous deprivation through the procedures used and the probable value of additional procedural safeguards - weighs heavily in Mr. Mena's favor. As the Second Circuit notes in *Black*, because there are no meaningful procedural safeguards under 1226(c), "almost *any* additional procedural safeguard at some point in the detention would add value." *Black*, 103 F.4th at 153 (emphasis in original). Furthermore, "the almost nonexistent procedural protections in place for 1226(c) detainees markedly increase [] the risk of an erroneous deprivation of [Petitioner's] private liberty interests." *Id.* at 152.

62.     In analyzing the risk of erroneous deprivation: "[t]he only interest to be considered ... is that of the detained individuals—not the government." *Black*, 103 F.4th at 152. In 1226 (c) there is "no mechanism for a detainee's release, nor for individualized review of the need for detention." *Id.* "The only procedural protection in place is the *Joseph* hearing, at which noncitizens can contest whether they in fact committed a crime that makes them subject to mandatory

detention." *Id*. A non-citizen will receive a full bond hearing only if an immigration judge determines at the Joseph hearing that they were not properly included in the mandatory detention category.  . Mr. Mena requested a *Joseph* hearing on February 16, 2024.  The IJ concluded that Mr. Mena's state conviction was for an aggravated felony and, as a result, declined to afford him full individualized bond hearing. *See* Exh. I.

63.     As in *Black*, "the almost nonexistent procedural protections in place for section 1226(c) detainees markedly increase[ ] the risk of an erroneous deprivation of [Petitioner's] private liberty interests." *Id*. Section 1226(c) "does not take into account when the prior crimes were committed…suggesting that the prior conviction may well be a poor proxy for a finding of dangerousness." *Id.* (internal citations omitted). Mr. Mena was eighteen years old in 1995 at the time of the conduct giving rise to the removal proceeding.  That was twenty nine years ago. He is now forty  years old. Therefore, there are high chances an independent decision maker would not have found him to present any current or future danger to the community. *See Chi Thon Ngo*, 192 F.3d at 398.  ("[P]resenting danger to the community at one point by committing crime does not place [one] forever beyond redemption.").

64.     Moreover, Mr. Mena continues challenging the determination that he is removable as an aggravated felon in his removal case. If Mr. Mena prevails on his argument, it would mean that he was also erroneously determined to be subject to mandatory detention to begin with. As such, the risk of an erroneous deprivation of private liberty interests is even higher in this case than in *Black*.

### III. The Government's Interest Favors a New Bond Hearing.

65.     The third Mathews factor is the public interest, and the fiscal and administrative burden of additional or substitute procedural safeguards. 424 U.S. at 335. In *Black* the Court

identifies two Government interests in support of mandatory detention: (1) to ensure appearance at proceedings; (2) protect the community from noncitizens involved in certain crimes. *Black*, 103 F.4th at 153 (citing *Demore*, 538 U.S. at 518-21). Government interests may justify short-term detention but the balance shifts from Government to Petitioner as detention is prolonged without individualized assessment of necessity. *Id*. at 154. *Black* holds that a bond hearing does not undermine an immigration judge's ability to assess whether a noncitizen presents a danger to the community or risk of flight. Id. at 154. Rather than burdening the Government, additional process to ensure that Mr. Mena's continued detention is necessary serves the Government's interest in only imposing such prolonged incarceration where it is truly necessary.

66.    The Government has no interest in eliminating vital support to a noncitizen's family where there is no finding of flight or danger. *Id.*; *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020); *see* Exh. B. "When the Government incarcerates individuals it cannot show to be a poor bail risk for prolonged periods of time, as in this case, it separates families and removes from the community breadwinners, caregivers, parents, siblings, and employees." *Velasco Lopez*, 978 F.3d at 855. The Government has no legitimate interest in keeping Mr. Mena from providing vital support to help his seventy-seven-year old mother, without a finding of dangerousness or flight.

67.    Mr. Mena and his mother implore this Court to give him the opportunity to be reunited so that he may provide the emotional and financial support to her in her old age, and alleviate the burden she carries as primary caregiver for disabled family members. Exh. A, B. Mr. Mena underscores that the public interest weighs against the separation of U.S. citizens from their immediate family members without a hearing a finding of a dangerousness or flight risk As such, the third factor also weighs in Mr. Mena's favor.

## IV. <u>This Court Should Hold a Bond Hearing in the First Instance.</u>

68.     Mr. Mena requests that this Court hold a bond hearing the first instance and order his release.  "Habeas lies to enforce the right of personal liberty; when that right is denied and a person confined, the federal court has the power to release him." *Fay v. Noia*, 372 U.S. 391, 430 (1963); *Enoh*, 2017 WL 2080278, at *2 ("[O]rdering a petitioner's release is the very essence of habeas relief.)

69.     This Court's ability to hold its own bond hearing and order a petitioner's release is inherent in its habeas authority. *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001) (holding that federal courts have inherent authority to release habeas petitioners on bail); *Leslie v. Holder*, 865 F. Supp. 2d 627, 634 (M.D. Pa. 2012) ("[T]he power to order bail in habeas proceedings is a legal and logical concomitant of the court's habeas corpus jurisdiction.").

70.     Therefore, the Court may remedy the constitutional violation in this case by holding its own bond hearing rather than ordering an immigration judge to hold a hearing. *See Hechavarria*, 358 F. Supp. 3d at 235 ("[A] federal court always retains jurisdiction to enforce its lawful judgments, including habeas judgments, [and] the court has the authority to see that its judgment is fully effectuated."); *Santos v. Lowe*, No. 1:18-cv-1553, 2020 WL 4530728 (M.D. Pa. Aug. 6, 2020) (indicating that the Court would conduct its own bond determination); *Thaxter v. Sabol*, No. 1:14-cv-02413, 2016 WL 3077351, at *3 (M.D. Pa. June 1, 2016) (referring bond determination to a magistrate judge rather than an immigration judge); *Judulang v. Chertoff*, 562 F. Supp. 2d 1119, 1127 (S.D. Cal. 2008) (ordering release).

71.     While courts in this District typically remand such hearings to an IJ in the first instance, the unique facts of this case warrant a different approach. *See, e.g.*, *Hechavarria*, 358 F. Supp. 3d at 243. The Batavia Immigration Court is a three-judge court with a pattern of noncompliance with the conditions contained in bond orders issued by this Court. These failures

to comply have necessitated petitioners' meritorious motions to enforce writs of habeas corpus. This additional litigation further prolongs the detention of the immigrants in ICE custody at BFDF; it is against the interest of judicial economy at both district and administrative levels.

72.    In several recent instances, this Court has granted the enforcement motions of immigrants detained at Batavia, finding that the IJs did not provide a constitutionally adequate bond hearing. *See e.g.*, *Davis v. Garland*, No. 22-CV-443-LJV, 2023 WL 1793575, at *2 (W.D.N.Y. Feb. 7, 2023), *appeal withdrawn*, No. 23-534, 2023 WL 6897443 (2d Cir. July 27, 2023); *Mathon v. Searls*, 623 F. Supp. 3d 203, 218 (W.D.N.Y. 2022);; *Pucha Quituizaca v. Barr*, 2021 WL 6797494, at *1 (W.D.N.Y. Jan. 5, 2021);

73.    Rather than risk further errors by the agency that could require Mr. Mena to return to this Court to enforce its judgment, the Court should hold a hearing now to determine whether Mr. Mena's continued detention is necessary.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

1)    Assume jurisdiction over this matter;

2)    Declare Petitioner's ongoing prolonged detention by Respondents, without a constitutionally-adequate bond hearing, to be unconstitutional;

3)    Issue a Writ of Habeas Corpus and order the immediate release of Petitioner on the ground that his continued detention has become unconstitutional;

4)    In the alternative, issue a Writ of Habeas Corpus and hold a bond hearing at which the Government, in order to continue detention, must establish by clear and convincing evidence that Petitioner presents a risk of flight or danger, even after consideration of alternatives to detention that could mitigate any risk that Petitioner's release would present. Or, order

Respondents to schedule such a hearing before an immigration judge within ten days from the date

of this Court's order. If Respondents fail to schedule a bond hearing, order Petitioner's release.

5)      Award Petitioner his costs and reasonable attorney fees in this action as provided

for by the Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on

any other basis justified under law;

6)      Grant such further relief as the Court deems just and proper.

DATED: January 14, 2025                          LEGAL SERVICES OF NEW JERSEY
Edison, New Jersey                               By: /s/Oleksandra Byelyakova
                                                 Oleksandra Byelyakova, Esq.
                                                 Olivia Kaplan, Esq
                                                 Legal Services of New Jersey
                                                 100 Metroplex Drive, Suite 101
                                                 Edison, New Jersey 08818
                                                 obyelyakova@lsnj.org
                                                 (732) 529-8254


                                                 *Attorneys for Petitioner*

**VERIFICATION**

I am submitting this verification on behalf of the Petitioner because I am Petitioner's attorney. On the basis of those discussions, on information and belief, I hereby verify that the factual statements made in the attached Verified Petition are true and correct to the best of my knowledge.

DATED: January 14, 2025                LEGAL SERVICES OF NEW JERSEY
        Edison, New Jersey            <u>By: /s/Olivia Kaplan</u>
                                          Olivia Kaplan, Esq.
                                          Oleksandra Byelyakova, Esq.
                                          Legal Services of New Jersey
                                          100 Metroplex Drive, Suite 101
                                        Edison, New Jersey 08818
                                          okaplan@lsnj.org
                                          (732) 529-8323

24

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:    ☐ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE _____    SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

Tulio Rafael MENA,

           *Petitioner*,

   v.

Joseph E. FREDEN , in his official capacity as Deputy Field Office Director and Administrator of the Buffalo Federal Detention Facility; Thomas BROPHY, in his official capacity as Buffalo Field Office Director for U.S. Immigration and Customs Enforcement; Patrick LECHLEITNER, in his official capacity as Director of U.S. Immigration and Customs Enforcement; Alejandro MAYORKAS, in his official capacity as Secretary of the U.S. Department of Homeland Security; Merrick GARLAND, in his official capacity as Attorney General of the United States,

           *Respondents*.

Case No. 1:25-cv-49

**VERIFIED PETITION FOR WRIT OF HABEAS CORPUS**

## EXHIBITS

A-1    Declaration of Tulio Rafael Mena, Petitioner

A-2    Petitioner's Associates of Arts degree and coursework toward his Bachelor of Arts

A-3    Photographs of Petitioner and his U.S. citizen family during family support visits in state custody

A-4    Denial of Petitioner's request to work in the immigration facility's library

B    Copy of the Petitioner's Immigrant Visa and Alien Registration, issued by the American Embassy in Santo Domingo and reflecting arrival in the United States on September 28, 1980

C    Declaration of Carmen Maria Meniuer de Mena, Petitioner's mother (November 19, 2024)

D    Certificate of Naturalization of Carmen Maria Menieur de Mena, Petitioner's mother (March 14, 2008)

E    Certificate of Naturalization of Tulio Tomas Mena, Petitioner's father (September 5, 1997)

F    Petitioner's Notice to Appear (December 6, 2023)

G    I-830, Notice to EOIR, Change of Alien Address (February 21, 2024)

H    Order of the Immigration Judge granting the DHS' Motion to Change Venue (February 21, 2024) and a copy of the DHS' Motion to Change Venue (February 21, 2024)

I    Immigration Judge's Order and Written Decision, ordering Petitioner's removal (June 17, 2024)

J    Decision of the Board of Immigration Appeals (December 13, 2024)

K    Copy of the public docket for the United States Court of Appeals for the Second Circuit, Mena v. Garland, Docket No. 24-3309, reflecting

Petitioner's filing of a petition for review,  motion for stay of removal, and

motion to proceed *in forma pauperis* (December 20, 2024)

L     Complaint filed with the Office for Civil Rights and Civil Liberties

submitted June 7, 2024, the Inspector General, the Detention Ombudsman,

and the ICE Field Officer Director regarding detention conditions in Batavia

Federal Detention Facility

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

TULIO RAFAEL MENA,          )
                                 )
                                 )
               Petitioner,    )
                                 )
                                 )
v.                                    )
                                 )
                                 )
JOSEPH E. FREDEN,        )
                                 )
                                 )
               Respondent.   )
                                 )
                                 )

## **PETITIONER'S DECLARATION IN SUPPORT OF WRIT OF HABEAS CORPUS**

I, Tulio Rafael Mena, under the penalty of perjury, hereby affirm that the following is true and correct to the best of my knowledge. I am currently in ICE custody at the Buffalo Federal Detention Facility (BFDF). I came to the United States at age three as a lawful permanent resident in September 1980 with my parents. I have lived in the United States since 1980. I attended New York City schools and remember pledging allegiance to the flag in school as a child. I grew up in Manhattan with my mother and father, who became United States citizens. I am the youngest of five children. We lived at 568 West 192nd Street, Apartment 44 New York, New York 10040, in a fourth floor walkup apartment. My mother and older sister still reside there.

I graduated from Aviation High School in Long Island City, Queens, New York in June 1994. In 1995 I was an 18 year old college student and enrolled in Lehman College in the Bronx. In the summer of 1995, an older friend convinced me to do something stupid he had done without getting caught before: to hold up some gas stations using a fake gun. In the robbery no one was injured and we obtained very little money. We were promptly arrested and I confessed to the police. I am deeply remorseful for my past actions. At that time I was an irresponsible teenager and did not consider the consequences. I was convicted of robbery in 2009, and served 15 years in East Jersey state prison. Thirty years have gone by since the crime for which I was placed in removal proceedings. I am now 48 years old.

**Conditions in ICE detention at BFDF are more restrictive than Maximum Security Prison.**

ICE detention in Buffalo is so restrictive that ironically I long for the freedom and privileges I had as a prisoner in maximum security state prison.  I never imagined that being a prisoner at East Jersey State Prison would allow me more freedom than civil detention at BFDF.  I am locked in a cell between 16.5 and 18 hours a day, every day.  I prepared a schedule of the times we are in and out of the cell, as well as a chart of my schedule while at East Jersey State Prison.  *Exh.* A-1.  In prison, I was on a unit but never locked in a cell for a prolonged period.

In Unit A-1 at BFDF, where I am housed, it is so restrictive that it is even used as SHU (special housing unit) overflow.  To have non-disciplinary housing used as a SHU would be unthinkable in prison.  The SHU is a punishment or disciplinary action housing designed to be segregated from general population.  The fact that the disciplinary setting is mixed with the general population shows that there is no housing difference between the SHU and the general population housed in Unit A-1.

The designation of A-1 as a SHU further restricts my already very limited time out of my cell.  For example, whenever someone from SHU has to be moved out of their cell, the rest of the general population unit has to "lock in" their cells, and the limited recreation time is whittled down even further.  For being in this Unit, recreation time is significantly diminished.  Cutting recreation time often involves having to cut short or not have conversations with family.  This causes distress to my family members.  In this way BFDF imposes a loss of privileges which are not caused by my conduct.

**ICE uses Collective Punishment and Threatens Solitary Confinement as Retribution.**

Guards at BFDF tell us that we are there for being "criminals", and some act as though it is their job to punish.  In prison, for good behavior there is a reward with time off.  In ICE custody, good behavior does not matter because the ICE officers will threaten you with 24-hour lockdown for what other detainees do, even though you have nothing to do with it.  The entire unit has been threatened with 24 hour lockdown when some detainees went on a hunger strike.  It was shocking to me that guards use collective punishment.  We should not have our extremely limited time out of cell further limited because of the facility's  movement of individuals in the SHU.

**ICE penalizes detainees and deprives us of privileges through a secret classification system in which it is not possible to redeem oneself and positive individual behavior does not matter.**

In prison I had no disciplinary infractions or loss of privileges.  I got credit for good behavior.  I attended every educational program available to me.  I was awarded my Associates

Degree from Raritan Valley Community College in May 2022. *Exh* A-2. I also began fulfilling requirements towards my Bachelor's Degree at Rutger's University. My family visited me regularly. *Exh*. A-3. In ICE custody unlike in state prison, the visits are non-contact. Not being able to embrace your loved ones deprives you of their support. In prison, unlike in ICE custody, I was able to call my family when I wanted to.

Recently I requested to work in the law library. I have requested to know my housing classification so that I might get an explanation as to why ICE has found it necessary that I remain in a cell 18 hours a day. ICE refused to provide me with what that high classification is, or how they determined it or when. However, they denied my request to work in the library on the basis that my classification was too high to leave my unit. *Exh*. A-4. In prison, the classification is something that everyone in prison knows about themselves.

In a recent slew of raids, they confiscated a AAA battery for a radio, labeling it "contraband", which I purchased at the BFDF commissary. Now I cannot listen to the radio (also purchased at the commissary) and have to sit in silence. I was shocked that BFDF would seize an AAA battery sold at their own commissary as contraband.

**Compared to prison, ICE significantly limits my ability to do work on my case.**

In prison I was also able to speak to my attorney to work on my case for the time necessary. In ICE custody at BFDF, I am limited to one hour a day for a virtual visit. This is very disruptive as it took many days to prepare this document because of that policy. In ICE custody, I am limited to one hour in the law library with an outdated version of LexisNexus. In prison, I was allowed to use the law library for up to 4 hours a day. In prison I was able to do legal research with LexisNexus that was up to date. In ICE custody, LexisNexus is long outdated. You are limited to how long you can see your lawyer, how long you can use the law library and when. This was a surprise to me as supposedly the purpose of ICE detention is to resolve an immigration case. So why are we so limited from working on our cases?

**Officers use unnecessary force against detainees to compel obedience because they do not have the language tools to communicate with them.**

None of the guards on the unit speak or understand Spanish and cannot verbally communicate with the detainees. I am often asked to interpret basic conversations and instructions between detainees and ICE officers, which I willingly do. This often includes sensitive and confidential information about detainees' cases. One or two ICE officers will use their cell phones with a Google language app, but it is clear both still struggle to understand.

The lack of language capability on the part of the officers leads to miscommunications, and the officers giving out unduly harsh punishments for perceived failure to follow unclear instructions. This is what happened on the day of the hunger strike. One officer told a Spanish-speaking detainee on hunger strike to get dressed. The officer did not communicate in a way that

the detainee could understand, and this lead to the officer handcuffing and putting one detainee on full-body restraint and carrying him out of the unit on the gurney. This would not have been necessary had the officer spoken Spanish or been accompanied by an interpreter.

**Compared to prison, medical care, food, and hygiene in ICE custody is substandard.**

In prison there are dentists and a medical clinic on site. In ICE you have to wait months and have many appointments before you see an assistant to determine whether your problem even deserves medical attention. In prison every inmate is given their own clippers to cut their hair. In ICE detention, we are not allowed to have clippers or anything to cut hair. Barber appointments are scarce. In prison, one can shower when you want, and get hot water or a cup of coffee when you want. You can eat hot food in the morning. You have access to basic proteins like eggs and fish, not available in ICE detention. None of these things exist in ICE detention. There is no hot food in the morning, no eggs, no fish.

**Compared to prison, in ICE custody, housing mix is dangerous to the general population.**

In prison, people with very serious mental illnesses are housed in a separate unit from the rest of the general population. In BFDF, people with serious mental illnesses are housed in my unit, Unit A-1. There are individuals in my unit who are emotionally disturbed and dangerous. Their behavior is non-conforming to life in a correctional facility, and in my opinion they should be separated from the general population, like they are in prison. The officers know about this problem, as there is only one officer to 73-75 people. It is dangerous to us.

**ICE and Immigration Court caused delays to prolong my detention but are able to move quickly when going against their own laws and procedures.**

ICE officers picked me up from East Jersey State Prison on February 16, 2024 and brought me to Mt. Laurel where I was served with an NTA dated December 6, that my hearing was going to be at Elizabeth Immigration Court on February 27, 2024. He said that I would be housed in Moshannon and transferred there the following Monday or Tuesday. On the way from Mt. Laurel to Elizabeth, I asked the two female officers where they were taking me. They said I would be taken to Elizabeth and then would probably transferred to Buffalo. This did not make sense to be because of what the officer had just told me and because my NTA had my address listed as Moshannon. At around 1am on February 17, 2024, I was woken up to be shackled with seven other detainees and loaded into a van, and driven to Batavia.

Once at Batavia, no one told me anything as to where or when I would have a hearing. About a week after arriving, I received a motion to change venue. I did not have any opportunity to respond. There was no date for which I could respond to the motion. I was never served with the decision, but it was made before I received the motion. I was struggling and confused about whether I should be asking New York or New Jersey pro bono organizations to help me. Since

we did not know the Court, the organizations also did not know and there was confusion in making a decision about representing me.  As a result I had to ask for two adjournments.

**ICE Custody is Punishment and Un-American.**

BFDF is dehumanizing and demoralizing in a way that prison is not.  The time in the cell is so much more restrictive than East Jersey State Prison, a maximum security facility.  It is so much more restrictive that it is very clear that the purpose is punishment.  The BFDF officers they tell us we are there because we are criminals.

A BFDF you are limited to how long you can see your lawyer, how long you can use the law library and when.  This was a surprise to me as supposedly the purpose of ICE detention is to detain a noncitizen while they resolve an immigration case.  Unlike prison, there is no system in place or reason to these restrictions: it is punishment to discourage noncitizens into choosing deportation.  After growing up in America since I was three, I know what ICE is doing is un-American.

**Please release me so that I may go home to help my aging mother.**

As I mentioned, my mother and my late father are U.S. citizens.  My father passed away while I was in prison, on December 18, 2017.  My mother is turning 78 years old this February 2025.  To pay the basics of rent and utilities, she is still working full-time at an electronics factory.  She is diabetic and has rheumatoid arthritis.  My older sister Carmen is 59 years old and lives with my mother.  My sister lives on SSI.  She is legally blind, diabetic, and suffers from diabetic neuropathy.  She was recently seriously burned with boiling water when making coffee.  They both struggle to carry up groceries or even a gallon of milk up our four-floor walkup apartment.

I will fully comply with all terms of release deemed appropriate by the Court.  As America is the only country I have known and all my loved ones are here, I will fight to remain here.  I have just filed my pro se petition for review and motion for stay with the Second Circuit. I ask that this Court please release me, or in the alternative grant me the opportunity of a bond hearing, so that I may go home at last to assist my aging mother.

I, Tulio R. Mena, declare under penalty of perjury under the laws of the United States

that the foregoing is true and correct to the best of my knowledge and recollection.

_____                                    December 27, 2024
Tulio R. Mena                                              Date

# Exhibit A-1

# B.F.D.F. A-1 Daily Schedule

## Schedule A

| | | | |
|---|---|---|---|
| 7:25am – 7:50am | Breakfast Meal | (25mins to eat) |
| 7:50am – 9:40am | Recreation | (1hr 50mins) |
| 9:40am – 12:00pm | Locked in cell | (2hrs 20mins) |
| 12:00pm – 12:25pm | Lunch Meal | (25mins to eat) |
| 12:25pm – 3:00pm | Locked in cell | (2hrs 35mins) |
| 3:00pm – 4:10pm | Recreation | (1hr 10mins) |
| 4:10pm – 5:25pm | Locked in cell | (1hr 15mins) |
| 5:25pm – 5:50pm | Dinner Meal | (25mins to eat) |
| 5:50pm – 8:40pm | Recreation | (2hrs 50mins) |
| 8:40pm – 7:00am Following Day | Locked in cell | (10hrs 20mins) |

## Schedule B

| | | | |
|---|---|---|---|
| 7:00am – 7:25am | Breakfast Meal | (25mins to eat) |
| 7:25am – 10:00am | Locked in cell | (2hrs 35mins) |
| 10:00am – 11:10am | Recreation | (1hr 10mins) |
| 11:10am – 12:25pm | Locked in cell | (1hr 15mins) |
| 12:25pm – 12:50pm | Lunch Meal | (25mins to eat) |
| 12:50pm – 2:40pm | Recreation | (1hr 50mins) |
| 2:40pm – 5:00pm | Locked in cell | (2hrs 20mins) |
| 5:00pm – 5:25pm | Dinner Meal | (25mins to eat) |
| 5:25pm – 9:00pm | Locked in cell | (3hrs 35mins) |
| 9:00pm – 11:10pm | Recreation | (2hrs 10mins) |
| 11:10pm – 7:25am Following Day | Locked in cell | (8hrs 15mins) |

## Totals

| | Schedule A | Schedule B |
|---|---|---|
| **Locked in Cell** | 16hrs 30mins | 18hrs |
| **Recreation** | 5hrs 50mins | 5hrs 10mins |
| **Meal** | 1hr 15mins | 1hr 15min |

# B.F.D.F. A-1 Daily Schedule

**Law Library:**

  We are given 1 hour per day of access to the law library, however, the cases in Lexis Nexis are not up to date. For instance, in July 16, 2024, one may search for a Second Circuit Case decided as recent as May 31, 2024, and it will not show up in the law library's computers.

**Sleep Hygiene:**

  It is difficult to sleep because inside the cell there is an overhead night light that is continously on, it is never turned off. In other words, it is on 24 hours a day. This light is in addition to the regular overhead room light which works on a schedule. For example, it first comes on at 6:55am, then it's off at 9:55am (I am not aware of the afternoon times but I'll note them for our next meeting), and then are turned off at 9:55pm until the following day.

  This type of illumination is both pervasive and intrusive. while I try to sleep. When I close my eyelids I see the light penetrating through them. It is an experience akin to phosphene. I eventually fall asleep, however, every time I wake up I am restless, which carries over to how I feel throughout the day— tired/fatigued. It is very uncomfortable because it makes my body hurt while simultaneously feeding mentally drained. I refuse to take any medication since it is not an intrinsic problem.

East Jersey State Prison
Movement Schedule

6:40 AM      Work Detail call out
7:00 AM      Breakfast Meal call out
8:00 AM      Work Detail/Passes/Outside Rec (Yard) call out.
10:30 AM     Return to housing unit or Work Detail for Count.
11:00 AM     Locked in for Count.
11:30 AM     Count Clears/Work Detail call out.
12:00 PM     Lunch Meal call out/1st (Yard) call out
1:00 PM      Passes/Work Detail/2nd call for Yard call out
3:00 PM      Return to housing unit for Count.
3:30 PM      Locked in for Count.
4:30 PM      Count Clears/Work Detail call out.
4:45 PM      Dinner Meal call out/1st call for recreation.*
6:00 PM      Passes/Work Detail call out/2nd call for recreation.*
8:45 PM      Return to housing unit for Count.
9:00 PM      Lock in for Count until next day.

*During the summer it is outside (Yard) rec.
During the winter it is inside — Drill Hall — rec.
Scheduling changes when Daylight Savings time changes,
where longer days are outside and shorter days are
inside.

Also, the pass movement consist of any appointment to medical,
school classes, law library, appointments with staff (e.g. social work,
classification, mental health, etc.), dentist, or any other interviews.

# Exhibit A-2



# Raritan Valley Community College

By virtue of the authority vested in it,
and upon recommendation of the Faculty, the Board of Trustees

hereby confers upon

## Tulio R. Mena

the Degree of

### Associate of Arts
### Liberal Arts

Given at North Branch in the State of New Jersey,
this fourteenth day of May, Two Thousand Twenty-Two.





Chair, Board of Trustees

President

# Exhibit A-3



Left to right: Tulio  Mena and Carmen M. Mena (mother)
Family Support Visit



Left to right: Rosemary  Garcia (family friend), Marcos T. Mena (brother), Tulio T. Mena (father),
Carmen M. Mena (mother), Tulio Mena, Carmen C. Caballero (sister).
Family Support Visit



Left to right: ██████████ (niece), Tulio Mena (center), ██████████ (niece)

Family Visit



Left to right: Tulio Mena, and Thania Quezada (sister)

Tulio  Mena's 39 Birthday Visit 1 ███████



Left to right: Carmen M. Mena (mother), Tulio Mena (center), Tuilo T. Mena (father)
Family Support Visit



Left to right: Ivelise Alvarez (family friend), Thania Quezada (sister), Tulio Mena, Carmen M. Mena (mother) Family Support Visit

# Exhibit A-4

# Request #472866311

**Profile Photo:**



**Audit Photo:**



**Resident Info**

Name: TULIO MENA
Booking Number: 036826628
Nationality:
Submitted Date: 08/02/24 14:26
Submitted Room: A-1,221A/A1
Current Room: A-1,221A/A1
Facility: Buffalo, NY
MAC ID: 4846C1225D57
Device ID: 4846C1225D57

**Form Info**

Category: AGS
Form: Detainee Work Detail Request
Internal Tag: No Tag

**Request Info**

Status: CLOSED by LT Spiotta
Facility Deadline: 08/07/24 23:59

**Summary of Request:**

Recreation/ Law Library work detail

**Details of Request:**

**What is your Country of Citizenship?:**
Dominican Republic

**What position would you like to be considered for?:**
ATTN: Lt. SpiottaMay I be considered for the Rec/Law library Porter Position.I spoke to D.O. Prince, if
you approve me to work

| DATE/TIME | USER | ACTION | DETAILS |
|---|---|---|---|
| 09/25/24 15:08 | TULIO MENA | Viewed Staff Response | |
| 09/12/24 12:14 | TULIO MENA | Viewed Staff Response | |
| 08/09/24 15:51 | TULIO MENA | Viewed Staff Response | |
| 08/09/24 15:51 | TULIO MENA | Viewed Staff Response | |
| 08/09/24 15:49 | TULIO MENA | Viewed Staff Response | |
| **08/08/24 07:24** | **LT Spiotta** | **Staff Response** | **Unfortunately, your classification is too high to work outside of the unit.** |
| 08/08/24 07:24 | LT Spiotta | Changed Status | From 'Open' to 'Closed' |
| 08/05/24 07:31 | TULIO MENA | Viewed Staff Response | |

| DATE/TIME | USER | ACTION | DETAILS |
|---|---|---|---|
| 08/02/24 14:26 | TULIO MENA | Submitted New | Recreation/ Law Library work detail |

# Exhibit B

Uploaded on 03/31/20 MAR

**...OF HAS PROCESSED**

IV 6826628

## IMMIGRANT VISA AND ALIEN REGISTRATION

THE IMMIGRANT
☐ HAS ☒ HAS NOT
BEEN PREVIOUSLY IN
THE UNITED STATES

| (Family Name) | (First Name) | (Middle Name) | I & NS FILE NUMBER, IF KNOWN |
|---|---|---|---|
| MENA Menieur, | Tulio | Rafael | |

IN BY IMMIGRANT INSPECTOR — THE IMMIGRANT NAMED ABOVE ARRIVED IN THE UNITED STATES VIA

SEC. 212(a)(14) LABOR CERTIFICATION

D0902    9/28/80

(Name of vessel or flight no., of arrival)

☒ NOT APPLICABLE

INELIGIBILITY FOR VISA WAIVED UNDER SECTION

☒ ATTACHED

PS-3

☐ 212(a)    ☐ 212(h)

☐ NOT REQUIRED

☐ 212(g)    ☐ 212(i)

| DECLARED | COUNTRY | | MARITAL STATUS | SEX | NATIONALITY |
|---|---|---|---|---|---|
| Dom. Rep. | Student | Dom. Rep. | ☐ M ☒ S ☐ D ☐ P ☐ W | M | Dominican |

ADDRESS STREET ADDRESS
IN UNITED    375 Riverside Drive Apt. 43

CITY, STATE, AND ZIP CODE, IF AVAILABLE
New York, New York 10031

ACTION ON APPEAL    U.S.P.H.S.

This visa is issued under Section 221 of the Immigration and Nationality Act, and upon the basis of the facts stated in the application. Possession of a visa does not entitle the bearer to enter the United States if at the time he seeks to enter he is found to be inadmissible. Upon arrival in the United States, it must be surrendered to a United States Immigration Officer.

### IMMIGRANT CLASSIFICATION

AMERICAN EMBASSY

CLASSIFICATION SYMBOL    P5-3

AT Santo Domingo

FOREIGN STATE/OTHER AREA LIMITATION
Dominican Republic

IMMIGRANT VISA NO.
17051

David R. Ramos
Vice-Consul of the United States of America

| ISSUED ON | (Day) 29 | (Month) July | (Year) 1980 |
|---|---|---|---|

THE VALIDITY OF THIS VISA EXPIRES MIDNIGHT AT THE END OF

| | (Day) 28 | (Month) November | (Year) 1980 |
|---|---|---|---|

### PASSPORT

NO.    047128-LV

OR OTHER TRAVEL DOCUMENTS (Describe)
None

ISSUED
TO    Tulio Rafael Mena Menieur

BY    Passport Office-La Vega, RD

ON    July 8, 1980

Item No. 2)
Off 420
Cv Equiv    RD$20.00    or

| EXPIRES July 8, 1982 | IV 6826628 |
|---|---|

Exh. 2 - Adm.

# Exhibit C

## DECLARATION OF CARMEN MARIA MENIEUR DE MENA

November 19, 2024

I, Carmen Maria Menieur De Mena, hereby swear under penalty of perjury that the following is true and accurate to the best of my knowledge:

With a heart full of hope, I make this statement to request the release of my beloved son, Tulio Rafael Mena. As a citizen of the United States, I have always lived an honorable and respectable life, residing in the same address at 568 West 192nd Street, Apartment 44, New York, since 1981, 43 years in total. I was born on December 4, 1946, in Montecristi, Dominican Republic, and at 77 years old, I am the mother of five children, with Tulio Rafael being the youngest and a blessing in my life. As a mother, my only wish is to see him return home, where he has always belonged, to his family who loves him deeply and is waiting for him with open arms.

Tulio is the youngest of my five children. At 77 years old, I still work in a factory as a sampler and tester. Although it is a tough job, especially for my age, I do it with love and care because I know it has a purpose: to be able to help my son when he gets out.

I can't deny that sometimes I feel I no longer have the strength I once had, and that fills me with sadness. But I have to keep going because there's no other option. It is in these moments when I most wish my son were here with me. His support would make everything more bearable, and having him by my side would fill this journey, which now feels so lonely, with joy.
But in the meantime, here I am, giving my best, hoping that one day things will change and all this effort will be worth it.

I immigrated to the United States on September 28, 1980, with my deceased husband and my youngest son, Tulio Rafael, who was only three years old. We did so full of hope and dreams, seeking a better life, even though we left behind our homeland, our roots, and part of our family—my other four children. Later, thanks to God, we were able to bring my other children: Marcos, Alberto, Carmen Cecilia, and Thania, completing the family we missed so much. It was years of struggle, but also immense happiness having each other.

Since then, Tulio has lived his entire life here, never returning to the Dominican Republic, a country that now feels strange and foreign to him. The thought of him, my youngest son, having to face life in a place he doesn't know, without family or support, fills me with an indescribable sadness. It breaks my heart to imagine him alone. in unknown land, facing difficulties he doesn't deserve. As a mother, I feel a deep pain because I always dreamed of protecting him, of his life being filled with stability and love. The idea of seeing him go through this leaves me broken and inconsolable.

I wholeheartedly request that Tulio be allowed to return home. Life has been incredibly difficult without him. The passing of my deceased husband, Tulio's father, while he was

in prison, was a devastating loss for our family. Not having Tulio by my side during such a painful time made it even more unbearable. His absence has left a deep emotional and physical mark on me.

At my age, it is becoming increasingly hard to manage my daily life without his support. Simple things like carrying groceries up the stairs to our fourth-floor apartment have become a challenge.

I work full-time to support myself, but the weight of everything is becoming overwhelming. Tulio could make a big difference, helping me bear these burdens. Additionally, I have a legally blind daughter with serious health complications and a grandson who recently lost his sight due to diabetes. Both require constant care, and I am the only one who can provide it.

When Tulio leaves, his presence and support will be indispensable to me in these very difficult times. This situation is wearing me down physically and emotionally, and at my age, everything feels even heavier. I implore you to consider giving Tulio the opportunity to stay in the United States, as his support is crucial to my well-being and that of my family. If he is released, I assure you that I will make sure he attends all necessary court hearings, because I know that his return is essential for my stability and for caring for those who depend on me.

With a heart full of pain and hope, I dare to write these words. Tulio's father became a U.S. citizen in September 1997, when he was only 19 years old. If the citizenship process had been carried out more quickly, my son would also have had the privilege of being a citizen, and with that, he would have been able to return home after serving his sentence. But the reality is different, and here I am, pleading, with the broken soul of a mother, asking for your permission for him to return to his family. Each day without him is a reminder of what we lose, of what we can still heal if he is allowed to return. With all the love of a mother who never stops hoping, I implore you to consider what this opportunity means to us and allow him to come back home.

When Tulio was incarcerated at East Jersey State Prison in Rahway, visiting him was relatively accessible for our family. However, the distance between Buffalo and New York City has created an insurmountable barrier. Every time we try to get closer to him, the cost of transportation, flight tickets, and accommodation becomes an overwhelming financial and emotional burden. Not being able to see Tulio has been a constant reminder of the suffering and separation that has affected not only him but also all of us. This distance has not only been a punishment for Tulio but also a deep pain for our family, depriving us of being able to give him our love and support in the most difficult moments. Every day without seeing him weighs on our hearts, leaving a trace of sadness and longing that is hard to ease.

I present myself before you today to speak on behalf of my son Tulio, a man who, since 1995, has undergone a long and profound journey of transformation. It is impossible to ignore the changes he has experienced, both in his character and his perspective on

life. Tulio has made the most of his time in prison by studying, redirecting his life toward knowledge and personal growth. With effort and dedication, he graduated from university, proving that not only has he learned from his mistakes, but he has also worked tirelessly to become a better person.

Over the years, Tulio has shown a sincere commitment to his rehabilitation. He has participated in re-education programs, maintained a responsible attitude toward his process, and has been an example of overcoming challenges for those around him. The letters and interactions with his family, friends, and fellow inmates attest to this significant change. Tulio is willing to take full responsibility for his actions, fulfill his obligations, and attend all judicial hearings presented to him.

Therefore, with a heart full of hope and faith in his rehabilitation, I respectfully ask for compassion so that Tulio may return home. He is a fundamental pillar of our family, and both I and his loved ones need him with us to continue this journey of growth and healing. I am convinced that Tulio has changed, and that his return home will be an opportunity to continue demonstrating his maturity and commitment to the well-being of our family and society.

Thank you, honorable judge, for giving me the opportunity to address you at such a crucial time in my life and my son Tulio's life. Today, I come before your wisdom with a heart full of hope and plea, asking for an opportunity for Tulio, a man who has renewed himself and is determined to contribute positively to society. Tulio is a man of character, full of promises and dreams of self-improvement. I need him by my side so that together we can face the challenges life has imposed on me. Your support would not only lighten the weight of my burden, but also strengthen the bond of love and work that my heart owes him. I sincerely ask that you consider this request, knowing that your decision will not only impact our lives but will also contribute to the future of a human being full of potential and regret for the mistakes of the past.

Sincerely,

(Carmen Maria Menieur de Mena Signature)

Carmen María Menieur de Mena


I, Thania Quezada, hereby certify that I am fluent in both Spanish and English, and that I have accurately and competently translated the letter written by Carmen M. Mena from Spanish to English to the best of my abilities. I affirm that this translation is a true and faithful representation of the original content.

Thania Quezada 11/19/2024

2269 Hampden Place Apt #3J Bronx New York 10468 phone: 347 885-5113

## DECLARACIÓN DE CARMEN MARÍA MENIEUR DE MENA

Noviembre 19, 2024

Yo, Carmen María Menieur de Mena, por la presente juro bajo pena de perjurio que lo siguiente es verdadero y exacto según mi leal saber y entender:

Con el corazón lleno de esperanza, hago esta declaración para solicitar la liberación de mi amado hijo, Tulio Rafael Mena. Como ciudadana de los Estados Unidos, siempre he vivido una vida honrada y respetable, residiendo en el mismo hogar en 568 West 192nd Street, Apartamento 44, Nueva York, desde 1981, lo que suma 43 años. Nací el 4 de Diciembre de 1946 en Montecristi, República Dominicana, y, a mis 77 años, soy madre de cinco hijos, siendo Tulio Rafael el más joven y una bendición para mi vida. Como madre, mi único deseo es verlo regresar a casa, donde siempre ha pertenecido, con su familia que lo ama profundamente y lo espera con los brazos abiertos.

Tulio es el menor de mis cinco hijos. A mis 77 años, sigo trabajando en una fábrica como *sampler* y *tester*. Aunque es un trabajo pesado, especialmente para mi edad, lo hago con amor y cariño porque sé que tiene un propósito: poder ayudar a mi hijo cuando salga.

No puedo negar que a veces siento que ya no tengo las fuerzas de antes, y eso me llena de tristeza. Pero tengo que seguir adelante, porque no hay otra opción. Es en estos momentos cuando más anhelo que mi hijo esté aquí conmigo. Su apoyo haría todo más llevadero, y tenerlo a mi lado llenaría de alegría este camino que ahora siento tan solitaria. Pero mientras tanto, aquí estoy, dando lo mejor de mí, con la esperanza de que un día las cosas cambien y todo este esfuerzo valga la pena.

Emigré a los Estados Unidos el 28 de septiembre de 1980 con mi difunto esposo y mi hijo más pequeño, Tulio Rafael, con apenas tres años. Lo hicimos llenos de esperanzas y sueños, buscando una vida mejor, aunque dejando atrás nuestra tierra, nuestras raíces y parte de nuestra familia mis otros cuatros hijos. Más tarde, gracias a Dios, logramos traer a mis otros hijos: Marcos, Alberto, Carmen Cecilia y Thania, completando la familia que tanto extrañábamos. Fueron años de lucha, pero también de inmensa felicidad al tenernos unos a otros.

Desde entonces, Tulio ha vivido toda su vida aquí, sin regresar jamás a la República Dominicana, un país que ahora le resulta extraño y ajeno. Pensar en él, en mi hijo menor, teniendo que enfrentar una vida en un lugar que no conoce, sin familia ni apoyo, me llena de una tristeza que no puedo explicar. Me parte el alma imaginarlo solo, en tierra desconocida, enfrentando dificultades que no merece. Como madre, siento un dolor profundo, porque siempre soñé con protegerlo, con que su vida estuviera llena de estabilidad y amor. La idea de verlo pasar por esto me deja rota y sin consuelo.

Solicito con todo mi corazón que Tulio pueda regresar a casa. La vida ha sido increíblemente difícil sin él. La partida de mi difunto esposo, el padre de Tulio, mientras él estaba en prisión, fue una pérdida devastadora para nuestra familia. No tener a Tulio a mi lado en ese momento tan doloroso lo hizo aún más insoportable. Su ausencia ha dejado una huella profunda, tanto emocional como físicamente en mí.

A mi edad, me cuesta cada vez más llevar las riendas de mi vida diaria sin su apoyo. Cosas tan simples como subir las compras por las escaleras hasta nuestro apartamento en el cuarto piso se han convertido en un reto. Trabajo a tiempo completo para poder sostenerme, pero el peso de todo se está volviendo abrumador. Tulio podría hacer una gran diferencia, ayudándome a sobrellevar estas cargas. Además, tengo una hija legalmente ciega, con serias complicaciones de salud, y un nieto que recientemente perdió la vista por la diabetes. Ambos requieren cuidados constantes, y yo soy la única que puede proporcionarlos. Cuando Tulio salga, su presencia y apoyo serán indispensables para mí en estos momentos tan difíciles. Esta situación me desgasta física y emocionalmente, y a mi edad, todo me resulta aún más pesado. Le imploro que considere darle a Tulio la oportunidad de quedarse en los Estados Unidos, ya que su apoyo es crucial para mi bienestar y el de mi familia. Si es liberado, le aseguro que me encargaré de que asista a todas las audiencias judiciales necesarias, porque sé que su regreso es fundamental para mi estabilidad y para cuidar a los que dependen de mí.

Con el corazón lleno de dolor y esperanza, me atrevo a escribir estas palabras. El padre de Tulio se convirtió en ciudadano estadounidense en septiembre de 1997, cuando él apenas tenía 19 años. Si el proceso de ciudadanía se hubiera llevado a cabo de manera más ágil, mi hijo también habría tenido el privilegio de ser ciudadano y, con ello, habría podido regresar a casa después de cumplir su condena. Pero la realidad es otra, y me encuentro aquí, suplicando, con el alma rota de madre, pidiendo su permiso para que regrese con su familia. Cada día sin él es un recordatorio de lo que perdemos, de lo que aún podemos sanar si se le permite volver. Con todo el amor de una madre que no deja de esperar, le imploro que considere lo que significa para nosotros esta oportunidad, y le permita regresar a su hogar.

Cuando Tulio estaba encarcelado en la prisión de East Jersey State en Rahway, visitarlo era relativamente accesible para nuestra familia. Sin embargo, la distancia entre Buffalo y New York City ha creado una barrera insuperable. Cada vez que intentamos acercarnos a él, el costo del transporte, los boletos de avión y el alojamiento se convierte en una carga económica y emocional demasiado pesada. No poder ver a Tulio ha sido un constante recordatorio del sufrimiento y la separación que ha afectado no solo a él, sino también a todos nosotros. Esta lejanía no solo ha sido un castigo para Tulio, sino también un profundo dolor para nuestra familia, privándonos de poder brindarle nuestro amor y apoyo en los momentos más difíciles. Cada día sin verlo pesa en nuestros corazones, dejando una huella de tristeza y añoranza que difícilmente puede aliviarse.

Hoy me presento ante usted para hablar en nombre de mi hijo Tulio, un hombre que, desde 1995, ha recorrido un largo y profundo camino de transformación. Es imposible ignorar los cambios que ha experimentado, tanto en su carácter como en su perspectiva de la vida. Tulio ha aprovechado su tiempo en prisión para estudiar, redirigiendo su vida hacia el conocimiento y la superación personal. Con esfuerzo y dedicación, logró graduarse de la universidad, demostrando que no solo ha aprendido de sus errores, sino que también ha trabajado incansablemente para convertirse en una mejor persona.

A lo largo de los años, Tulio ha demostrado un compromiso sincero con su rehabilitación. Ha participado en programas de reeducación, ha mantenido una actitud responsable frente a su proceso y ha sido un ejemplo de superación para quienes lo rodean. Las cartas y las interacciones con su familia, amigos y compañeros de prisión atestiguan este cambio significativo. Tulio está dispuesto a asumir plena responsabilidad por sus acciones, cumplir con sus obligaciones y asistir a todas las audiencias judiciales que se le presenten.

Por ello, con el corazón lleno de esperanza y fe en su rehabilitación, le pido con todo respeto compasión para que Tulio pueda regresar a casa. Es un pilar fundamental de nuestra familia, y tanto yo como sus seres queridos lo necesitamos con nosotros para continuar este viaje de crecimiento y sanación. Estoy convencida de que Tulio ha cambiado, y que su regreso a casa será una oportunidad para seguir demostrando su madurez y compromiso con el bienestar de nuestra familia y la sociedad.

Gracias, honorable juez, por brindarme la oportunidad de dirigirme a usted en un momento tan crucial para mi vida y la de mi hijo, Tulio. Hoy vengo ante su sabiduría con el corazón lleno de esperanza y súplica, pidiendo una oportunidad para Tulio, un hombre que se ha renovado y que está decidido a contribuir positivamente a la sociedad. Tulio es un hombre de carácter, lleno de promesas y sueños de superación. Necesito tenerlo a mi lado para que juntos podamos enfrentar los desafíos que la vida me ha impuesto. Su apoyo no solo aliviaría el peso de mi carga, sino que también fortalecería el lazo de amor y trabajo que tanto le debe mi corazón. Le pido de todo corazón que considere este pedido, sabiendo que su decisión no solo impactará nuestras vidas, sino que también contribuirá al futuro de un ser humano lleno de potencial y arrepentimiento por los errores del pasado.

Atentamente,

Carmen María Menieur de Mena

# Exhibit D

# UNITED STATES OF AMERICA

## CERTIFICATE

**DEPARTMENT OF HOMELAND SECURITY**

No. 30449941

**CERTIFICATE OF NATURALIZATION**

Personal description of holder as of date of naturalization:

Date of birth: 1916

Sex: FEMALE

Height: 5 feet 5 inches

Marital status: MARRIED

Country of former nationality: DOMINICAN REPUBLIC



INS Registration No.: A036826627

I certify that the description given is true, and that the photograph affixed hereto is a likeness of me.

*Carmen Maria Menieur De Mena*
(Complete and true signature of holder)

Be it known that, pursuant to an application filed with the Secretary of Homeland Security

at:   **NEW YORK, NEW YORK**

The Secretary having found that:

**CARMEN MARIA MENIEUR DE MENA**

then residing in the United States, intends to reside in the United States when so required by the Naturalization Laws of the United States; and had in all other respects complied with the applicable provisions of such naturalization laws and was entitled to be admitted to citizenship, such person having taken the oath of allegiance in a ceremony conducted by the

**U.S. CITIZENSHIP AND IMMIGRATION SERVICES**

at:   **NEW YORK, NEW YORK**     on:     **MARCH 14, 2008**

that such person is admitted as a citizen of the United States of America.

*Director, U.S. Citizenship and Immigration Services*



IT IS PUNISHABLE BY U. S. LAW TO COPY, PRINT OR PHOTOGRAPH THIS CERTIFICATE, WITHOUT LAWFUL AUTHORITY.

FORM N-550 rev. 4/04

# Exhibit E

THE UNITED STATES OF AMERICA

CERTIFICATE OF NATURALIZATION

No. 22539366

Personal description of holder as of date of naturalization:

Date of birth: 1937

Sex: MALE

Height: 5 feet 08 inches

Marital status: MARRIED

Country of former nationality: DOMINICAN REPUBLIC

INS Registration No.: A36 826 626

I certify that the description given is true, and that the photograph affixed hereto is a likeness of me.

*Tulio Tomas Mena* (Complete and true signature of holder)



Be it known that, pursuant to an application filed with the Attorney General

at: NEW YORK, NY

the Attorney General having found that:

TULIO TOMAS MENA

then residing in the United States, intends to reside in the United States when so required by the Naturalization Laws of the United States, and had in all other respects complied with the applicable provisions of such naturalization laws and was entitled to be admitted to citizenship, such person having taken the oath of allegiance in a ceremony conducted by the

U.S. DISTRICT COURT
FOR THE SOUTHERN DISTRICT

at: NEW YORK, NY

on: SEPTEMBER 5TH, 1997

that such person is admitted as a citizen of the United States of America.

*Doris Meissner*
Commissioner of Immigration and Naturalization

IT IS PUNISHABLE BY U.S. LAW TO COPY, PRINT OR PHOTOGRAPH THIS CERTIFICATE, WITHOUT LAWFUL AUTHORITY.

FORM N-550 REV. 4-91

# Exhibit F

DEPARTMENT OF HOMELAND SECURITY

**NOTICE TO APPEAR**

DOB: ████ 1976

Event No: NEW2412000164

---

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: 390016150

File No: 036 826 628

In the Matter of:

Respondent: TULIO RAFAEL MENA AKA: ROBLES, RICARDO AKA: CHEVRES, FELIX _____ currently residing at:

555 Geo Drive Philipsburg,PENNSYLVANIA, 16866

(Number, street, city, state and ZIP code)　　　　(Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of DOMINICAN REPUBLIC and a citizen of DOMINICAN REPUBLIC;

3. You were admitted to the United States at or near New York, NY on or about September 28, 1980, as a lawful permanent resident (P53);

4. You were, on August 22, 2011, convicted in the Superior Court of the State of New Jersey in Bergen County, for the offense of Robbery in violation of N.J.S.A. 2C:15-1, and you were sentenced to 15 years confinement.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act (Act), as amended, in that, at any time after admission, you have been convicted of an aggravated felony as defined in section 101(a)(43)(G) of the Act, a law relating to a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment at least 1 year was imposed.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:　☐ 8CFR 208.30　☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

625 EVANS ST RM 148A ELIZABETH NJ 07201. ELIZABETH DETENTION CENTER

(Complete Address of Immigration Court, including Room Number, if any)

on 2-27-24　at　1:30 PM　to show why you should not be removed from the United States based on the

(Date)　　　(Time)

charge(s) set forth above.

R #4076 VALLE-HANDECH - SDDO

(Signature and Title of Issuing Officer)

Date: December 6, 2023

Newark, NJ

(City and State)

---

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

---

## Request for Prompt Hearing

To expedite a determination in my case. I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before:

_____
*(Signature of Respondent)*

Date: _____

_____
*(Signature and Title of Immigration Officer)*

### Certificate of Service

This Notice To Appear was served on the respondent by me on __2-16-24__, in the following manner and in compliance with section 239(a)(1) of the Act.

☒ in person ☐ by certified mail, returned receipt # _____ requested ☐ by regular mail

☐ Attached is a credible fear worksheet.

☒ Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the __English__ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_____
*(Signature of Respondent if Personally Served)*

_____
*(Signature and Title of officer)*

Exh. 1 - Adm.

EOIR – 2 of 3

## Privacy Act Statement

**Authority:**

The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C, 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**

You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**

For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**

Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

# Exhibit G

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## NOTICE TO EOIR: ALIEN ADDRESS

Date: <u>February 21, 2024</u>

To:   Enter Name of BIA or Immigration Court I-830 <u>EOIR SPC BATAVIA, NY</u>

   Enter BIA or Immigration Court Three Letter Code@usdoj.gov <u>BTV</u>

From: Enter Name of ICE Office <u>ERO - BATAVIA, NY SPC SUB-OFFICE</u>

   Enter Street Address of ICE Office <u>ERO BATAVIA DETENTION FACILITY</u>

   Enter City, State and Zip Code of ICE Office <u>BATAVIA, NY 14020</u>

Respondent: Enter Respondent's Name <u>MENA-MENIEUR, Tulio</u>

   Alien File No: Enter Respondent's Alien Number   <u>036 826 628</u>

---

This is to notify you that this respondent is:

☐ Currently incarcerated by federal, state or local authorities. A charging document has been served on the respondent and an Immigration Detainer-Notice of Action by the ICE (Form I-247) has been filed with the institution shown below. He/she is incarcerated at:

Enter Name of Institution where Respondent is being detained

Enter Street Address of Institution where Respondent is being detained

Enter City, State and Zip code of Institution where Respondent is being detained

**Enter Respondent's Inmate Number**

His/her anticipated release date is Enter Respondent's Anticipated Release Date.

☒ Detained by ICE on **Enter Date Respondent was Detained by ICE** at: <u>02/16/2024</u>

Enter Name of ICE Detention Facility where Respondent is being detained   <u>BUFFALO FEDERAL DETENTION FACILITY</u>

Enter Street Address of ICE Detention Facility where Respondent is being detained   <u>4250 FEDERAL DRIVE</u>

Enter City, State and Zip Code of ICE Detention Facility where Respondent is being detained   <u>BATAVIA, NY 14020</u>

☐ Detained by ICE and transferred on **Enter Date Respondent was transferred** to:
Enter Name of ICE Detention Facility where Respondent has been transferred

Enter Street Address of ICE Detention Facility where Respondent has been transferred

Enter City, State and Zip Code of ICE Detention Facility where Respondent has been transferred

☐ Released from ICE custody on the following condition(s):
   ☐ Order of Supervision or Own Recognizance (Form I-220A)
   ☐ Bond in the amount of Enter Dollar Amount of Respondent's Bond
   ☐ Removed, Deported, or Excluded
   ☐ Other

---

Upon release from ICE custody, the respondent reported his/her address and telephone number would be:
**Enter Respondent's Street Address**

Enter Respondent's City, State and Zip Code

Enter Respondent's Telephone Number (including area code)

☐ I hereby certify that the respondent was provided an EOIR-33 Form and notified that they must inform the Immigration Court of any further change of address.

ICE Official: Enter Your First, Last Name and Title  <u>Deportation Officer J 0598 KLAYBOR</u>

---

ICE Form I-830E (9/09)                                                                                          Page 1 of 1

# Exhibit H



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**ELIZABETH IMMIGRATION COURT**

Respondent Name:

    MENA, TULIO RAFAEL

To:

    Denis Bronk
    U.S. Department of Homeland Security
    4250 Federal Drive
    Batavia, NY 14020

A-Number:
036826628
Riders:
In Removal Proceedings
Date:
02/21/2024

**ORDER OF THE IMMIGRATION JUDGE**

Upon due consideration of ☐ Respondent's ☑ The Department of Homeland Security's motion for change of venue filed in this manner, and having been satisfied that the non-moving party was accorded notice and an opportunity to respond, for the following reason(s) the immigration court hereby orders that the motion for CHANGE OF VENUE is:

☑ GRANTED, as the requirements of 8 C.F.R. § 1003.20(b) have been met.
      Venue is changed to Batavia Immigration Court

          Respondent's new address is:
          MENA, TULIO RAFAEL
          BFDF
          4250 FEDERAL DRIVE
          BATAVIA, NY 14020
          Respondent's new attorney/representative (if any) is

☐ DENIED, as no good cause shown has been shown. *See* 8 C.F.R. § 1003.20(b).

☐ DENIED, as no fixed address including city, state, and zip code, where Respondent may be reached for further hearing notification was provided. *See* 8 C.F.R. § 1003.20(c).

☐ Other / Further explanation

Immigration Judge: PANOPOULOS, ADAM 02/21/2024

**Certificate of Service**

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service

To: [ ] Noncitizen | [ M ] Noncitizen c/o custodial officer | [ ] Noncitizen's atty/rep. | [ M ] DHS

Respondent Name : MENA, TULIO RAFAEL | A-Number : 036826628

Riders:

Date: 02/21/2024 By: RODRIGUES, CINDY, Court Staff

Denise Bonk                                                     **DETAINED**
Assistant Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
4250 Federal Drive
Batavia, NY 14020

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## ELIZABETH, NEW JERSEY

| IN THE MATTER OF | <u>IN REMOVAL PROCEEDINGS</u> |
|---|---|
| **Tulio MENA-MENIEUR** | **CASE # A036 826 628** |
| RESPONDENT | |

## DEPARTMENT OF HOMELAND SECURITY
## MOTION FOR CHANGE OF VENUE

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## ELIZABETH, NEW JERSEY

| | |
|---|---|
| IN THE MATTER OF | IN REMOVAL PROCEEDINGS |
| Tulio MENA-MENIEUR | CASE # A036 826 628 |
| RESPONDENT | |

## DEPARTMENT OF HOMELAND SECURITY
## MOTION FOR CHANGE OF VENUE

Comes now, the Department of Homeland Security ("DHS"), by and through the undersigned Counsel, respectfully moves this Honorable Court to change venue to the proper Immigration Court pursuant to 8 C.F.R. § 1003.20(b).

An Immigration Judge may change venue for good cause upon motion by one of the parties. 8 C.F.R. § 1003.20(b). Good cause is determined by the balancing of relevant factors, including, among others, administrative convenience, expeditious treatment of the case, the location of witnesses, and, if an alien is in detention, the costs of transporting witnesses or evidence to a new location. *Matter of Rahman*, 20 I&N Dec. 480, 482-83 (BIA 1992); *Matter of Rivera*, 19 I&N Dec. 688 (BIA 1988); *Matter of Velasquez*, 19 I&N Dec. 377, 382 (BIA 1986).

In the present case, the respondent is now in ICE custody at the Buffalo Federal Detention Facility. See attached Form I-830. DHS requests that venue be changed to the Batavia Immigration Court in Batavia, New York. See 8 CFR § 1003.20.

Respectfully submitted on this 21st day of February,2024.

Denise Bonk
Assistant Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## ELIZABETH, NEW JERSEY

| IN THE MATTER OF | <u>IN REMOVAL PROCEEDINGS</u> |
|---|---|
| **Tulio MENA-MENIEUR** | **CASE # A036 826 628** |
| RESPONDENT | |

## <u>ORDER OF THE IMMIGRATION JUDGE</u>

Upon consideration of the DHS Motion to Change Venue to the **Batavia Immigration Court**, it is HEREBY ORDERED THAT THE MOTION BE [ ] **GRANTED** [ ] **DENIED** because:

[ ] DHS does not oppose the motion.
[ ] The respondent does not oppose the motion.
[ ] A response to the motion has not been filed with the court.
[ ] Good cause has been established for the motion.
[ ] The court agrees with the reasons stated in the opposition to the motion.
[ ] The motion is untimely per _____.
[ ] Other: _____.

Deadlines:

[ ] The application(s) for relief must be filed by _____.
[ ] The respondent must comply with DHS biometrics instructions by _____.

Dated: _____          _____

Honorable Immigration Judge

ELIZABETH, NEW JERSEY

## CERTIFICATE OF SERVICE

THIS DOCUMENT WAS SERVED BY: MAIL (M)   PERSONAL SERVICE (P) FAX (F)

TO: [ ]  ALIEN   [ ] ALIEN c/o Custodial Officer [ ] ALIEN'S ATT/REP [ ] DHS

DATE: _____          BY: _____

Attachments:  [ ] EOIR-33   [ ] EOIR – 28  [ ] Legal Service List  [ ] Other

EOIR – 3 of 5

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## ELIZABETH, NEW JERSEY

| | |
|---|---|
| N THE MATTER OF<br><br>**Tulio MENA-MENIEUR**<br><br>RESPONDENT | IN REMOVAL PROCEEDINGS<br><br>**CASE # A036 826 628** |

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of February, 2024, I caused to be served a true and copy of this document:

☐    by placing a true copy thereof in a sealed envelope, with postage thereon fully to be prepaid and causing the same to be mailed by first class mail to the person at the address set forth below.

☐    by certified mail-return receipt requested to the person at the address set forth below.

☒    an identical copy hand-delivered to a responsible person at the address, set forth below, of the individual being served.
     (See Immigration Court Practice Manual, Chapter 3.2)

**Tulio MENA-MENIEUR**
**c/o Buffalo Federal Detention Facility**
**4020 Federal Drive**
**Batavia, NY 14020**

I declare under penalty of perjury that the foregoing is true and correct. Executed on 2/21/2024.

Edwin C. Martin Jr.
Legal Assistant
U.S Department of Homeland Security
Immigration and Customs Enforcement

# Exhibit I

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
4250 FEDERAL DRIVE, ROOM F108
BATAVIA, NY 14020


Legal Services of New Jersey
Salazar, Rachel Elizabeth
100 Metroplex Dr.
Suite 402
Edison, NJ 08817

In the matter of                File A 036-826-628        DATE: Jun 17, 2024
MENA, TULIO RAFAEL


___ Unable to forward - No address provided.
___ Attached is a copy of the decision of the Immigration Judge. This decision
is final unless an appeal is filed with the Board of Immigration Appeals
within 30 calendar days of the date of the mailing of this written decision.
See the enclosed forms and instructions for properly preparing your appeal.
Your notice of appeal, attached documents, and fee or fee waiver request
must be mailed to:      Board of Immigration Appeals
                        Office of the Clerk
                        5107 Leesburg Pike, Suite 2000
                        Falls Church, VA 22041
___ Attached is a copy of the decision of the immigration judge as the result
of your Failure to Appear at your scheduled deportation or removal hearing.
This decision is final unless a Motion to Reopen is filed in accordance
with Section 242b(c)(3) of the Immigration and Nationality Act, 8 U.S.C. §
1252b(c)(3) in deportation proceedings or section 240(b)(5)(C), 8 U.S.C. §
1229a(b)(5)(C) in removal proceedings.  If you file a motion to reopen, your
motion must be filed with this court:
                        IMMIGRATION COURT
                        4250 FEDERAL DRIVE, ROOM F108
                        BATAVIA, NY 14020
___ Attached is a copy of the decision of the immigration judge relating to a
Reasonable Fear Review. This is a final order. Pursuant to 8 C.F.R. §
1208.31(g)(1), no administrative appeal is available. However, you may file
a petition for review within 30 days with the appropriate Circuit Court of
Appeals to appeal this decision pursuant to 8 U.S.C. § 1252; INA §242.
___ Attached is a copy of the decision of the immigration judge relating to a
Credible Fear Review. This is a final order. No appeal is available.
XX Other: Order of the Immigration Judge.


                              E.LANG
                              COURT CLERK
                              IMMIGRATION COURT                     FF
        cc: Michael Dreher, Assistant Chief Counsel
            4250 Federal Drive
            Batavia, NY, 14020

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
BATAVIA, NEW YORK

|  |  |
|---|---|
| In the Matter of: | A # 036-826-628 |
| **TULIO RAFAEL MENA** | **IN REMOVAL PROCEEDINGS** |
| Respondent |  |

| **CHARGE:** | INA § 237(a)(2)(A)(iii) | Conviction for an Aggravated Felony, Theft Offense.. |
|---|---|---|
|  | INA § 237(a)(2)(A)(iii) | Conviction for an Aggravated Felony, Crime of Violence |
| **APPLICATION:** | Motion to Terminate | |

***ON BEHALF OF RESPONDENT***
Rachel Elizabeth Salazar
Legal Services of New Jersey
100 Metroplex Dr., Suite 101
Edison, NJ 08817

***ON BEHALF OF DHS***
Peter Marche. Assistant Chief Counsel
Department of Homeland Security
4250 Federal Drive
Batavia. NY 14020

*DECISION AND ORDER OF THE IMMIGRATION JUDGE*

## I.  PROCEDURAL HISTORY

Tulio Rafael Mena ("Respondent") is a native and citizen of Dominican Republic. Respondent arrived in the United States at New York, NY, on or about an September 28, 1980, as a lawful permanent resident. A Notice to Appear was served on Respondent on February 16, 2024. See Exh. 1 (Notice to Appear ("NTA")). The Department of Homeland Security served a form I-261. Additional Charges of Inadmissibility/Deportability on April 2, 2024. See Exh. 1A ("I-261").

Respondent filed a motion to terminate proceedings on April 18, 2024.

DHS responded in opposition to the motion on April 25, 2024.

For the reasons set forth below, the Court will deny the motion to terminate.

## II.  EXHIBITS

Exhibit 1:                              Notice to Appear.

| | | |
|---|---|---|
| Exhibit 1A: | Form I-261, Additional Charges of Inadmissibility/Deportability | |
| Exhibit 2: | DHS Evidence Part 01, Showing Respondent's Lawful Admission, filed March 6, 2024. | |
| | Tab A | I-213 |
| | Tab B | Immigrant Visa and Alien Registration |
| | Tab C | Record of Conviction and Indictment |
| Exhibit 3 | Evidence attached to Respondent's Legal Brief, filed May 20, 2024 | |
| | Tab A | N.J.S.A. 2C:15-1 Robbery, as effective in 1995. |
| | Tab B | NJ.S.A. 2C:20-4 Theft by Deception, as effective 1995 |
| | | N.J.S.A. 2C:20-4 Theft by Deception, as amended April 2003 |
| Exhibit 4 | DHS Evidence, filed May 24, 2024 | |
| | Tab A | Related New Jersey Statutes Annotated 1995 |

| | |
|---|---|
| 1 | 2C:15-1. Robbery |
| 2 | 2C:11-1. Definitions |
| 3 | 2C:20-2. Consolidation of theft offenses; grading: provisions applicable to theft generally |
| 4 | 2C:20-3. Theft by unlawful taking or disposition |
| 5 | 2C:20-4. Theft by deception |
| 6 | 2C:20-5. Theft by extortion |
| 7 | 2C:20-7. Receiving stolen property |
| 8 | 2C:20-8. Theft of services |
| 9 | 2C:20-9. Theft by failure to make required disposition of property received |

## III.  LEGAL STANDARDS AND ANALYSIS

After the commencement of removal proceedings, only an immigration judge may terminate proceedings upon the request or motion of either party. *Matter of G-N-C-*, 22 I&N Dec. 281 (BIA 1998); *see also* 8 C.F.R. § 1239.2(c). A respondent may request termination if DHS has not met its burden of proof. *See* 8 CFR § 1239.2(f); *Matter of Acosta-Hidalgo*, 24 I&N Dec. 103 (BIA 2007). Here, DHS bears the burden of establishing by clear and convincing evidence that Respondent is removable as charged. *See* INA § 240(c)(3)(A); 8 C.F.R. § 1240.8(a); *see also Woodby v. INS*, 385 U.S. 276, 286 (1966).

EOIR – 3 of 16

### A.    Categorical Approach

In determining whether a prior conviction is categorically an aggravated felony or a crime involving moral turpitude ("CIMT"), courts must apply the categorical approach, focusing solely on whether the elements of the offense forming the basis for the conviction sufficiently match the elements of the generic (or commonly understood) version of the enumerated crime, while ignoring the particular facts of the case. *See Mathis v. United States*, 136 S. Ct. 2243 (2016); *Moncrieffe v. Holder*, 133 S.Ct. 1678, 1684 (2013). Under the categorical approach, the Court determines "whether 'the state statute defining the crime of conviction' categorically fits within the 'generic' federal definition of a corresponding" offense[1] rather than "the facts of the particular prior case[.]" *Moncrieffe*, 133 S.Ct. at 1684 (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 186 (2007) (citing *Taylor v. United States*, 495 U.S. 575, 599–600 (1990))).

The Court "must presume that the conviction 'rested upon [nothing] more than the least of th[e] acts' criminalized, and then determine whether even those acts are encompassed by the generic federal offense." *Id.* (alterations in original) (quoting *Johnson v. United States*, 559 U.S. 133, 137 (2010). In other words, the courts "look only to the minimum criminal conduct necessary to satisfy the essential elements of the crime." *Mendez v. Barr*, 960 F.3d 80, 84 (2d Cir. 2020) (quoting *Mendez v. Mukasey*, 547 F.3d 345, 348 (2d Cir. 2008)).[2] A state offense is a categorical match to a generic federal offense only if a conviction under the state statute "necessarily involved . . . facts equating to [the] generic [federal offense]." *Moncrieffe*, 133 S.Ct. at 1684 (alterations in original) (quoting *Shepard v. United States*, 544 U.S. 13, 24 (2005)). If the least culpable conduct is a categorical match to the generic federal offense, the analysis ends and the conviction is a categorical match. If the least culpable conduct is not a match, then there is no categorical match. If the statute encompasses some crimes that meet the federal or CIMT definition and others that do not, then the Court must determine if the statute is divisible and whether it can proceed to the modified categorical approach. *Descamps v. United States*, 570 U.S. 254, 258 (2013) (stating that courts may not apply the modified categorical approach "when the crime of which the defendant was convicted has a single, indivisible set of elements"). A state statute is divisible if it "encompasses multiple categories of offense conduct, some, but not all, of which would categorically constitute" a removable offense. *Vargas-Sarmiento v. U.S. Dep't of Justice*, 448 F.3d 159, 166 (2nd Cir. 2006).

---

[1] This analysis will differ if determining whether a statute is categorically a CIMT as the statute at issue will be compared to the definition of a CIMT, and not to a corresponding aggravated felony. The Board of Immigration Appeals ("BIA") has described a CIMT as a "nebulous concept, which refers generally to conduct that shocks the public conscience as being inherently base, vile, or depraved, contrary to the rules of morality and the duties owed between man and man, either one's fellow man or society in general." *Matter of Perez-Contreras*, 20 I&N Dec. 615, 617–18 (BIA 1992) (citation omitted). A finding that a crime is a CIMT requires "reprehensible conduct committed with some degree of scienter," whether specific intent, deliberateness, willfulness, or recklessness. *Matter of Louissaint*, 24 I&N Dec. 754, 757 (BIA 2009); *see also Matter of Silva-Trevino*, 26 I&N Dec. 826, 828 n.2, 833–34 (BIA 2016); *Matter of Leal*, 26 I&N Dec. 20, 21 (BIA 2012).

[2] In *Mota v. Barr*, __ F.3d __, 2020 WL 4743168, at *3 (2d Cir. Aug. 17, 2020), the Second Circuit dismissed the petitioner's argument that felony possession of narcotics with intent to sell, in violation of Conn. Gen. Stat. § 21a-277(a)(1), includes conduct that is not necessarily morally turpitudinous. The Court noted that the petitioner's "hypothetical scenario" is incompatible with the categorical approach, in which the Court focuses only on "the intrinsic nature of the offense rather than the particular facts surrounding the petitioner's conviction." *Id.* (internal quotation marks omitted).

EOIR - 4 of 16

## B.    Divisibility

A criminal statute is divisible if it "list[s] potential offense elements in the alternative" and "at least one. but not all" of these alternative versions of the offense is, by its elements, a predicate offense. *Descamps v. United States*, 570 U.S. 254, 264 (2013); *see also Matter of Chairez-Castrejon (Chairez-Castrejon III)*. 26 I&N Dec. 819, 819-20 (BIA 2016) (clarifying that "the understanding of statutory 'divisibility' embodied in *Descamps* and *Mathis* applies in immigration proceedings nationwide to the same extent that it applies in criminal sentencing proceedings") (citing *Mathis v. United States*, 136 S. Ct. 2243, 2253 n.3 (2016)). When all of a statute's elements either fit within or fall outside the relevant predicate offense definition, the statute is not divisible. *Descamps v. United States*, 570 U.S. 254, 261 (2013).

In *Mathis v. United States*, the Supreme Court defined "'elements' [as] the 'constituent parts' of a crime's legal definition—the things the 'prosecution must prove to sustain a conviction.'" 136 S. Ct. 2243. 2248 (2016) (citing BLACK'S LAW DICTIONARY 634 (10th ed. 2014)); *see also Descamps v. United States*, 570 U.S. 269 (2013) (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)) (explaining that an offense's "elements" are those facts about the crime which a jury, and not a sentencing court, will find by the unanimous vote and beyond a reasonable doubt). At a trial, they are what the jury must find beyond a reasonable doubt to convict the defendant, *see Richardson v. United States*, 526 U.S. 813. 817 (1999); and at a plea hearing, they are what the defendant necessarily admits when he pleads guilty. *See McCarthy v. United States*, 394 U.S. 459. 466 (1969).

*Mathis v. United States* provided lower courts with guidance on how to determine whether an alternatively phrased item is an element or a means. Courts should look at the statute itself and state case law. Some statutes specify whether an item listed in the alternative is an element or a means. *See Mathis v. United States*, 136 S. Ct. 2243, 2256 (2016). "A statute may itself identify which things must be charged (and so are elements) and which need not be (and so are means)." *Mathis v. United States*. 136 S. Ct. 2243, 2256 (2016). Moreover. the statute may associate different punishments for alternative items: if conviction under one alternative results in a different punishment than conviction under another alternative. they must be different elements. *Mathis v. United States*, 136 S. Ct. 2243, 2256 (2016) (citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000)). If the statute contains a list of "illustrative examples," then it includes only a crime's means of commission. *Mathis v. United States*. 136 S. Ct. 2243, 2256 (2016).

Courts may also look to state case law that identifies an alternatively phrased item as an element or means. *Mathis v. United States*, 136 S. Ct. 2243, 2256 (2016); *see also Matter of Chairez-Castrejon (Chairez-Castrejon IV)*. 27 I&N Dec. 21, 23 (BIA 2017) ("Where State case law does not address the distinction between elements and means in the context of a specific criminal statute. we see nothing unreasonable or impermissible about seeking guidance in cases interpreting statutes with similar language and structure."). In the event that the statutory language and state case law are inconclusive. courts may conduct an initial, limited view of the record of conviction. *Mathis v. United States*. 136 S. Ct. 2243, 2256 (2016). The scope of this review is even narrower than that allowed under the modified categorical approach: at this stage in the analysis, the court is limited to determining whether the alternatively phrased items in question

4

constitute means or elements. *Mathis v. United States*, 136 S. Ct. 2243, 2256-57 (2016). The court may "peek" at the relevant jury instructions and the charging document in conducting its divisibility analysis; however, it is only concerned with "those facts that *had* to be proved or admitted in order to convict." *Matter of Chairez-Castrejon (Chairez-Castrejon IV)*, 27 I&N Dec. 21, 23-24 (BIA 2017) (emphasis added) (finding that the divisibility of a statute was not established where the admission of a "knowing" mental state contained in the respondent's plea agreement was not tethered to any fact charged in the amended information, which contained no *mens rea* allegation with respect to the respondent' discharge of a firearm). Finally, if the statute, case law, and record of conviction are all inconclusive, the court cannot find that the respondent's conviction is a categorical match to a generic offense. *Mathis v. United States*, 136 S. Ct. 2253, 2257 (2016) (quoting *Shepard v. United States*, 544 U.S. 14, 21 (2005)) (noting that "such record materials will not in every case speak plainly, and if they do not, a sentencing judge will not be able to satisfy '*Taylor*'s demand for certainty' when determining whether a defendant was convicted of a generic offense.").

If the statute is overbroad and indivisible, the statute is not a categorical match to the generic offense and the analysis ends. If the statute is overbroad and divisible, the Court can proceed to the modified categorical approach to determine if the element under which the alien was convicted is a match with the generic offense.

## C.    Modified Categorical Approach

If a statute is divisible, the modified categorical approach may be employed to determine which of the alternative versions of the offense formed the basis of a respondent's conviction. *Descamps v. United States*, 570 U.S. 254, 258 (2013). The modified categorical approach "merely helps implement the categorical approach when a defendant was convicted of violating a divisible statute" and "retains the categorical approach's central feature: a focus on the elements, rather than the facts, of a crime." *Descamps v. United States*, 570 U.S. 254, 263 (2013); *Moncrieffe v. Holder*, 569 U.S. 184, 1684 (2013) (holding that under the categorical approach, "we examine what the state conviction necessarily involved, not the facts underlying the case").

The Second Circuit in *United States v. Genao* noted that "the modified categorical approach requires a two-step process: 'first, [the sentencing court] determine[s] if the statute is divisible, such that some categories of proscribed conduct render an [enhancement appropriate] ...; second, [the court] consult[s] the record of conviction to ascertain the category of conduct of which the [defendant] was convicted.'" 869 F.3d 136, 145 (2d Cir. 2017) (*quoting United States v. Moreno*, 821 F.3d 223, 227 (2d Cir. 2016)).

Courts are permitted only to "look to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." *United States v. Genao*, 869 F.3d at 145 (quoting *Mathis*, 136 S. Ct. at 2251). These documents are known as "Shepard documents." *See generally Shepard v. United States*, 544 U.S. 13, 24 (2005). While police reports are generally not part of the record of conviction, they may be properly considered if the contents were otherwise specifically incorporated into the guilty plea or were admitted by the alien during the criminal proceedings. *Matter of Milian-Dubon*, 25 I&N Dec. 197 (BIA 2010).

EOIR - 6 of 16

Having determined under which portion of the statute the respondent was convicted, the analysis then turns to whether that version of the offense, by its elements, necessarily constitutes a predicate offense, such as a CIMT or a crime of child abuse, under the INA.

**D.    ANALYSIS: INA § 237(a)(2)(A)(iii), Aggravated Felony – Theft or Burglary Offense.**

The date of offense for Respondent's conviction under N.J.S.A. 2C:15-1, Robbery in the First Degree, was July 19, 1995. Ex. 2, at 7, 11, 12. Respondent was found guilty by jury trial verdict, on May 20, 2009, for the offenses of Robbery in the first degree, in violation of N.J.S.A. 2C:15-1 (two counts), and two counts of Unlawful Possession of Imitation Firearm, in violation of N.J.S.A. 2C:39-4E, fourth degree crimes. The two firearms offenses merged into the respective Robbery convictions. On August 22, 2011, Respondent was sentenced to a prison term of fifteen years on each robbery count, which were run consecutive to each other, with parole ineligibility for seven- and one-half years on each count. *Id.* Notably, neither the conviction record nor the indictment sets forth which subsection of N.J.S.A. 2C:15-1 Respondent was accused of violating and for which he was convicted.

At the time of the commission of the offense, N.J.S.A. 2C:15-1 provided:

**2C:15-1. Robbery**

a. Robbery defined. A person is guilty of robbery if, in the course of committing a theft, he:

(1) Inflicts bodily injury or uses force upon another; or

(2) Threatens another with or purposely puts him in fear of immediate bodily injury; or

(3) Commits or threatens immediately to commit any crime of the first or second degree. An act shall be deemed to be included in the phrase "in the course of committing a theft" if it occurs in an attempt to commit theft or in immediate flight after the attempt or commission.

b. Grading. Robbery is a crime of the second degree, except that it is a crime of the first degree if in the course of committing the theft the actor attempts to kill anyone, or purposely inflicts or attempts to inflict serious bodily injury, or is armed with, or uses or threatens the immediate use of a deadly weapon.

*See* Ex. 3, Tab A; Ex. 4, at 2.

The DHS served a Notice to Appear ("NTA") on Respondent on February 16, 2024, and filed said NTA with the Court on that same date. The NTA charged Respondent with removability under INA § 237(a)(2)(A)(iii), which provides in relevant part: "in that, at any time after admission, you have been convicted of an aggravated felony as defined in section

6

101(a)(43)(G) of the Act, a law relating to a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment at least 1 year was imposed."

As set forth above, Respondent was sentenced to a fifteen-year prison sentence on each count, so for the offense a "term of imprisonment [of] at least 1 year was imposed." The Court then must analyze whether the statute of conviction is appropriately defined as a theft offense.

The key phrase in the statute is "…in the course of committing a theft…."

Respondent correctly argues that:

> In Matter of Garcia Madruga, the Board of Immigration Appeals ("BIA") directly addressed the question of whether INA § 101(a)(43)(G) covers a theft offense that includes theft by deception where property is taken with consent of the owner. It conclusively found it does not. The BIA further found that a theft offense that includes theft by deception or any other type of consensual transfer of property may be analyzed as a fraud offense, but is categorically not a theft offense under INA §101(a)(43)(G). Matter of Garcia-Madruga, 24 I&N Dec. 436, 438-440 (BIA 2008).
>
> -Motion to Terminate, filed April 29, 2024, at 2 (hereinafter "MTT").

Respondent thereby argues that the New Jersey statute is overbroad because it can be committed when property is taken with the consent of a property owner, such as in Theft by Deception. MTT, at 4.

However, Respondent's argument is unavailing because:

> New Jersey case law indicates that a theft underlying a robbery offense is limited to theft by unlawful taking under New Jersey Statutes section 2C:20-3. *See State v. Whitaker*, 983 A.2d 181, 190 (N.J. 2009) "(A person is guilty of theft 'if he unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof.' N.J.S.A. 2C:20-3(a)"); *State v. Farrad*, 753 A.2d at 653 ("A prerequisite for a robbery conviction is a theft or attempted theft. *See* N.J.S.A.2C:20-3(a)"). *See also State v. Jordan*, 572 A.2d 676, 679 (N.J. Super. Ct. App. Div. 1990) (finding that theft of movable property and shoplifting are lesser included offenses of robbery). *C.F. State v. Smith*, 642 A.2d 978, 980 (N.J. 1994) (finding that theft of services is not a lesser included offense of robbery); *State v. Talley*, 466 A.2d 78, 82 (N.J. 1983) (finding that **theft by deception** is not a lesser included offense of robbery).

-*See In re: A.R.T.M., aka AT*, A#: xxx-xxx-740 (BIA Sept. 9, 2019), attached hereto as Exhibit A (emphasis supplied). *See also K.A. v. Attorney General of the United States*, 997 F.3d 99, 105-113 (3d Cir. 2022); and for an analysis of each of the separate New Jersey theft statutes in effect at the time of this respondent's conviction, *Id.* at 110-112.

Each of the separate New Jersey theft statutes that are applicable to the Robbery statute at the time of the commission of the crime were analyzed by the Third Circuit Court of Appeals

and found to meet the generic definition of theft offenses. This Court adopts that analysis. *Id.* The Court finds that Respondent's robbery conviction under New Jersey Statutes Annotated § 2C:15-1, constitutes an aggravated felony because the elements of the statute categorically match the controlling definition of "theft offense."

The Court finds that DHS met its burden to establish by clear, unequivocal, and convincing evidence that Respondent is removable under INA § 237(a)(2)(A)(iii), as it relates to INA 101(a)(43)(G).

### E.   ANALYSIS: INA § 237(a)(2)(A)(iii), Aggravated Felony – Crime of Violence.

The DHS served a form I-261, Additional Charges of Inadmissibility/Deportability, on Respondent on April 2, 2024, and filed the I-261 with the Court on that same date. The I-261 charged Respondent with removability under INA § 237(a)(2)(A)(iii), which provides in relevant part: "at any time after admission, you have been convicted of an aggravated felony as defined in Section 101(a)(43)(F) of the Act, a crime of violence (as defined in section 16 of Title 18, United States Code, but not including a purely political offense) for which the term of imprisonment ordered is at least one year."

Having found that the DHS established Respondent's removability as set forth above, the Court need not, and will not, address the second charge of removability under INA § 237(a)(2)(A)(iii), as it relates to INA § 101(a)(43)(F).

### CONCLUSION

After a careful review of the record, the following Order will be entered:

### *ORDERS*

**IT IS HEREBY ORDERED** that the charge of removability pursuant to INA § 237(a)(2)(A)(iii), as it relates to INA § 101(a)(43)(G) is **SUSTAINED by clear, unequivocal and convincing evidence.**

**IT IS FURTHER ORDERED** that the charge of removability pursuant to INA § 237(a)(2)(A)(iii), as it relates to INA § 101(a)(43)(F) is **NOT RULED ON.**

**IT IS FURTHER ORDERED** that Respondent's Motion to Terminate is **DENIED.**

June 14, 2024
      Date

ROBERT DRISCOLL
Digitally signed by ROBERT DRISCOLL
Date: 2024.06.14 16:23:32 -04'00'

ROBERT P. DRISCOLL
U.S. Immigration Judge

CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY: MAIL (M)    PERSONAL SERVICE (P) E-Electronic
TO: [ ] ALIEN  [ ] ALIEN c/o Custodial Officer  ☒ ALIEN's ATT/REP  ☒ DHS
DATE: 6/17/2024  BY: COURT STAFF  E.Lang
Attachments:  [ ] EOIR-33  [ ] EOIR-8  [ ] Legal Services List  [ ] Other

EOIR - 10 of 16

# EXHIBIT A

EOIR - 11 of 16

NAME AND A# REDACTED

**U.S. Department of Justice**                          Decision of the Board of Immigration Appeals
Executive Office for Immigration Review

Falls Church, Virginia 22041

File:   AXXX-XXX-740 – Elizabeth, NJ              Date:        • SEP – 9 2019

In re:   A R T M a.k.a. A T

IN REMOVAL PROCEEDINGS

APPEAL

ON BEHALF OF RESPONDENT:   Pro se

APPLICATION:   Termination; asylum; withholding of removal; Convention Against Torture

 

The respondent, a native and citizen of the Dominican Republic and lawful permanent resident of the United States, appeals from the Immigration Judge's April 9, 2019, decision finding him removable as charged and denying his applications for asylum and withholding of removal under sections 208 and 241(b)(3) of the Act, 8 U.S.C. §§ 1158, 1231(b)(3), and his request for protection under the Convention Against Torture. 8 C.F.R. §§ 1208.16-.18.[1]  The appeal will be dismissed.

We review an Immigration Judge's findings of fact, including credibility determinations, under a "clearly erroneous" standard. 8 C.F.R. § 1003.1(d)(3)(i). We review questions of law, discretion, and judgment and all other issues in appeals from decisions of Immigration Judges de novo. 8 C.F.R. § 1003.1(d)(3)(ii).

On March 4, 2016, the respondent was convicted of robbery – threat or fear of bodily injury in violation of New Jersey Statutes Annotated (NJSA) section 2C:15-1(a)(2) (Exhs. 1, 2 at tab D). For this offense, the respondent was sentenced to a term of imprisonment of 3 years (*Id.*). The Immigration Judge found the respondent removable under section 237(a)(2)(A)(iii) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(2)(A)(iii), as an alien convicted of an aggravated felony as defined in section 101(a)(43)(G) of the Act, a law relating to a theft offense and denied his motion to terminate. The Immigration Judge pretermitted the respondent's applications for asylum, and withholding of removal. She then denied the respondent's application for deferral of removal under the Convention Against Torture. The respondent appeals from this decision.

We agree with the Immigration Judge's determination that the respondent's 2016 conviction for the offense of robbery – threat or fear of bodily injury in violation of NJSA § 2C:15-1(a)(2),

---

[1] The Immigration Judge's criminal analysis is set forth in an interim decision, dated September 10, 2018. In that decision, the Immigration Judge analyzed the applicable New Jersey criminal statute; found the respondent removable as an alien convicted of an aggravated felony theft offense under section 101(a)(43)(G) of the Act; and denied the respondent's motion to terminate proceedings. For ease of reference, this decision will hereafter be referenced as "IJ I" while the Immigration Judge's final administrative decision addressing relief from removal, issued on April 9, 2019, will be referenced as "IJ II."

AXXX-XXX-740

for which he received a 3 year sentence of imprisonment, constitutes an aggravated felony under section 101(a)(43)(G) of the Act (IJ I at 2-4).

The categorical approach requires that a reviewing court examine whether the elements of the offense underlying the conviction sufficiently correspond to the elements of the generic federal definition of the offense. *See Mathis v. United States*, 136 S.Ct. 2243, 2248 (2016). In determining what the state conviction necessarily involves, a court must presume that the conviction was based on the least of the acts criminalized under the state statute and decide whether those acts are encompassed by the generic offense. *See Moncrieffe v. Holder*, 133 S.Ct. 1678, 1684 (2013). However, a categorical analysis requires that there be a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime. *See Moncrieffe v. Holder*, 133 S.Ct. at 1693.

The term "aggravated felony" includes a theft offense for which the term of imprisonment is at least 1 year. *See* section 101(a)(43)(G) of the Act, 8 U.S.C. § 1101(a)(43)(G). A "theft offense" encompasses the "taking of property or an exercise of control over property without consent with the criminal intent to deprive the owner of rights and benefits of ownership, even if such deprivation is less than total or permanent." *See also Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007). *See also Matter of Garcia-Madruga*, 24 I&N Dec. 436, 440 (BIA 2008); *Matter of Ibarra*, 26 I&N Dec. 809, 811 (BIA 2016); *Matter of Delgado*, 27 I&N Dec. 100, 101 (BIA 2018).

On March 4, 2016, the respondent was convicted of Robbery, in violation of NJSA § 2C:15-1(a)(2), and sentenced to 3 years of imprisonment (IJ I at 2; Exhs. 1, 2 at tab D). At the time of his conviction, NJSA § 2C:15-1(a) provided: "A person is guilty of robbery if, *in the course of committing a theft*, he: (1) Inflicts bodily injury or uses force upon another; or (2) Threatens another with or purposely puts him in fear of immediate bodily injury; or (3) Commits or threatens immediately to commit any crime of the first or second degree" (emphasis added).

The New Jersey Supreme Court has determined that this offense is an aggravated form of theft. *See State v. Lopez*, 900 A.2d 779, 784 (N.J. 2006). It also determined that the offense includes the following elements: "(1) theft or attempted theft; (2) intimidating or assaultive conduct consisting of (a) inflicting bodily injury upon another or (b) threatening another with or purposely putting him in fear of immediate bodily injury or (c) committing or threatening immediately to commit any crime of the first or second degree [or (d) using force upon another person]; (3) the intimidating or assaultive conduct must have occurred during the theft or attempted theft or in immediate flight after the theft or attempted theft; and (4) defendant must have acted purposely." *See State v. Lopez*, 900 A.2d at 784; *State v. Farrad*, 753 A.2d 648, 653 (N.J. 2000). The New Jersey model jury instructions for robbery indicate that "theft" for purposes of its robbery statute "is defined as the unlawful taking, or exercise of unlawful control over property of another with purpose to deprive [the owner] thereof." New Jersey Judiciary, Model Jury Charge (Criminal) 3C:15-1 "Robbery in the Second Degree" (July 2, 2009).

The respondent argues on appeal that the New Jersey statute is overbroad because it can be committed without the consent of the property's owner and even with an honest, but mistaken, claim of right (Respondent's Br. at 7-14). We do not agree. The element of non-consent is fulfilled by both the element of force and because New Jersey case law indicates that a theft underlying a

EOIR - 13 of 16

AXXX-XXX-740

robbery offense is limited to theft by unlawful taking under New Jersey Statutes section 2C:20-3. *See State v. Whitaker*, 983 A.2d 181, 190 (N.J. 2009) "(A person is guilty of theft 'if he unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof.' N.J.S.A. 2C:20-3(a)"); *State v. Farrad*, 753 A.2d at 653 ("A prerequisite for a robbery conviction is a theft or attempted theft. *See* N.J.S.A. 2C:20-3(a)"). *See also State v. Jordan*, 572 A.2d 676, 679 (N.J. Super. Ct. App. Div. 1990) (finding that theft of movable property and shoplifting are lesser included offenses of robbery). *Cf. State v. Smith*, 642 A.2d 978, 980 (N.J. 1994) (finding that theft of services is not a lesser included offense of robbery); *State v. Talley*, 466 A.2d 78, 82 (N.J. 1983) (finding that theft by deception is not a lesser included offense of robbery).

The respondent's robbery conviction under New Jersey Statutes Annotated section 2C:15-1(a)(2) constitutes an aggravated felony because the elements of the statute categorically match the controlling definition of "theft offense." Therefore, the Immigration Judge correctly sustained the charge of removability under section 237(a)(2)(A)(iii) of the Act and denied the respondent's motion to terminate.

Having concluded that the respondent is removable under section 237(a)(2)(A)(iii) of the Act, we now turn to the question of his eligibility for relief from removal. During the proceedings below, the respondent sought asylum under section 208 of the Act, 8 U.S.C. § 1158; withholding of removal under section 241(b)(3)(A) of the Act, 8 U.S.C. § 1231(b)(3)(A); and protection under the Convention Against Torture; *see* 8 C.F.R. §§ 1208.16-1208.18.

The respondent's aggravated felony conviction renders him ineligible for asylum as a matter of law. Sections 208(b)(2)(A)(ii), and 208(b)(2)(B)(i) of the Act. Thus, the Immigration Judge properly denied his application for such relief (IJ II at 7). The only issues remaining to be decided are whether he qualifies for withholding of removal or protection under the CAT.

Section 241(b)(3)(B)(ii) of the Act provides that an alien is ineligible for withholding of removal if "the Attorney General decides that … the alien, having been convicted by a final judgment of a particularly serious crime, is a danger to the community of the United States." Where an applicant for withholding of removal has been convicted of an aggravated felony involving violence, as here, a legitimate question arises regarding the applicability of this "particularly serious crime" bar. Under the circumstances, the respondent had the burden to prove by a preponderance of the evidence that the particularly serious crime bar does not apply to him. *See* 8 C.F.R. § 1208.16(d)(2) (2013) ("If the evidence indicates the applicability of one or more of the grounds for denial of withholding enumerated in the Act, the applicant shall have the burden of proving by a preponderance of the evidence that such grounds do not apply."); *see also* 8 C.F.R. § 1240.8(d) (2013).

To determine whether the "particularly serious crime" bar is applicable, the Immigration Judge examines the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of the conviction. *Matter of N-A-M-*, 24 I&N Dec. 336, 342 (BIA 2007); *Matter of Frentescu*, 18 I&N Dec. 244, 247 (BIA 1982). Upon receiving the respondent's testimony and examining the conviction record (Exh. 2 at page 15), the Immigration Judge found that the nature of the respondent's conviction is inherently violent and the underlying circumstances of the

AXXX-XXX-740

conviction involved a car jacking (IJ II at 7). While we acknowledge the respondent's appellate challenge to the Immigration Judge's view of the facts, we discern no clear error in the Immigration Judge's findings. *See* 8 C.F.R. § 1003.1(d)(3)(i); *see also Anderson v. City of Bessemer City, NC*, 470 U.S. 564, 574 (1985) (explaining that where there are two permissible views of the evidence, the factfinder's choice between them cannot be deemed clearly erroneous). Based on the Immigration Judge's findings, moreover, we conclude that the respondent stands convicted of a "particularly serious crime." Thus, the Immigration Judge properly denied the respondent's application for withholding of removal.

The respondent's conviction of a particularly serious crime also precludes him from being granted withholding of removal under the Convention Against Torture, but it does not bar him from applying for deferral of removal under 8 C.F.R. § 1208.17. To qualify for deferral of removal, the respondent must demonstrate that he will more likely than not be "tortured" if removed to the Dominican Republic. For an act to constitute "torture" within the meaning of the CAT it must be:

> (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions.

8 C.F.R. § 1208.18(a).

The respondent fears that he will be tortured in the Dominican Republic because he was involved in a car accident that resulted in the death of a pedestrian (IJ II at 8; Tr. at 75-77; Exhs. 3, 3A). This pedestrian was a young girl that the respondent alleges is the daughter of the chief of police of Villa Duarte (IJ II at 8; Tr. at 67-68; Exhs. 3, 3A) . He further alleges that the young girl's family has threatened him on multiple occasions through his aunt who remains in the Dominican Republic (IJ II at 8; Tr. at 69-72.; Exhs. 3, 3A).

We agree with the Immigration Judge that the respondent has not demonstrated that it is "more likely than not" that he would be tortured upon his removal to the Dominican Republic "by or at the instigation of or with the acquiescence of a public official or other person acting in an official capacity" (IJ II at 8-9). *See* 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1); *Flores v. Att'y Gen.*, 856 F.3d 280, 298 (3d Cir. 2017). As the Immigration Judge found, the respondent did not suffer any past torture in the Dominican Republic (IJ II at 8). While the respondent alleges that he has been threatened by the family of the young girl and that her father is the chief of police of Villa Duarte, he has not submitted any evidence to support these assertions (IJ II at 8). *Myrie v. Att'y Gen. United States*, 855 F.3d 509, 518 (3d Cir. 2017).

We do not minimize the respondent's fear of returning to the Dominican Republic. It is well established, however, that an alien's eligibility for deferral of removal cannot be established by stringing together a chain of assumptions about what might happen in a worst case scenario. *Matter of J-F-F-*, 23 I&N Dec. 912, 917-18 (A.G. 2006); *Matter of M-B-A-*, 23 I&N Dec. 474, 479 (BIA 2002). Instead, such a claim must be predicated on solid evidence establishing that

AXXX-XXX-740

the applicant personally faces a *probability* (as opposed to a mere *possibility*) of torture. *Matter of S-V-*, 22 I&N Dec. 1306, 1313 (BIA 2000).

In conclusion, the respondent is removable and ineligible for asylum by virtue of his conviction for robbery – threat or fear of bodily injury. The respondent is also ineligible for withholding of removal because the circumstances surrounding his commission of that offense establish that it was a "particularly serious crime." Finally, the respondent is ineligible for deferral of removal under the CAT because he has not shown that he will more likely than not be "tortured" in the Dominican Republic.

Accordingly, the following order will be issued.

ORDER:  The appeal is dismissed.

_____

Edward R. Grn

FOR THE BOARD

# Exhibit J



**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*



*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

**Kaplan, Olivia**
**Legal Services of New Jersey**
**100 Metroplex Drive  Suite 101**
**Edison  NJ  08817**

**DHS/ICE Office of Chief Counsel - BTV**
**4250 Federal Dr.**
**Batavia NY 14020**

**Name: MENA, TULIO RAFAEL**                    **A 036-826-628**

**Date of this Notice:    12/13/2024**

Enclosed is a copy of the Board's decision and order in the above-referenced case.

Sincerely,

*Donna Carr*

Donna Carr
Chief Clerk

Enclosure

Userteam:  Docket



**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

_____

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

**MENA, TULIO RAFAEL**
**A 036826628**
**BFDF**
**4250 FEDERAL DRIVE**
**BATAVIA NY 14020**

**DHS/ICE Office of Chief Counsel - BTV**
**4250 Federal Dr.**
**Batavia NY 14020**

**Name: MENA, TULIO RAFAEL**                     **A 036-826-628**

**Date of this Notice:    12/13/2024**

Enclosed is a copy of the Board's decision in the above-referenced case. This copy is being provided to you as a courtesy. Your attorney or representative has been served with this decision pursuant to 8 C.F.R. § 1292.5(a). If the attached decision orders that you be removed from the United States or affirms an Immigration Judge's decision ordering that you be removed, any petition for review of the attached decision must be filed with and received by the appropriate court of appeals within 30 days of the date of the decision.

Sincerely,

*Donna Carr*

Donna Carr
Chief Clerk

Enclosure

Userteam: <u>Docket</u>

**NOT FOR PUBLICATION**

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

MATTER OF:

Tulio Rafael MENA, A036-826-628

Respondent

<div style="border:1px solid">

**FILED**

Dec 13, 2024

</div>

ON BEHALF OF RESPONDENT: Olivia Kaplan, Esquire

ON BEHALF OF DHS: Sydney V. Probst, Assistant Chief Counsel

IN REMOVAL PROCEEDINGS
On Appeal from a Decision of the Immigration Court, Batavia, NY

Before: Petty, Appellate Immigration Judge

PETTY, Appellate Immigration Judge

The respondent, a native and citizen of the Dominican Republic, appeals from the June 17, 2024, decision of the Immigration Judge denying his motion to terminate and finding him removable as charged. The Department of Homeland Security ("DHS") has filed a response in opposition to the appeal. The appeal will be dismissed.

We review findings of fact determined by an Immigration Judge, including credibility findings, under a "clearly erroneous" standard. 8 C.F.R. § 1003.1(d)(3)(i). We review questions of law, discretion, and judgment, and all other issues in appeals from decisions of Immigration Judges de novo. 8 C.F.R. § 1003.1(d)(3)(ii).

On August 22, 2011, the respondent was convicted of first-degree robbery under section 2C:15-1 of the New Jersey Statutes and sentenced to 15 years imprisonment (Exh. 2 at 7). Based on that conviction, DHS charged the respondent with removability under section 237(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227(a)(2)(A)(iii), as a noncitizen convicted of an aggravated felony theft offense as defined by section 101(a)(43)(G) of the INA, 8 U.S.C. § 1101(a)(43)(G) (Exh. 1). The respondent filed a motion to terminate removal proceedings before the Immigration Judge arguing that he was not convicted of a removable offense. The Immigration Judge denied the motion to terminate in an order issued on June 17, 2024, and ordered the respondent removed from the United States. The present appeal followed.

To determine whether an offense qualifies as an aggravated felony, we employ the categorical approach by comparing the elements of the respondent's offense to the generic federal definition. *Matter of C. Morgan*, 28 I&N Dec. 508, 510 (BIA 2022) (citing *Mathis v. United States*, 579 U.S. 500, 504 (2016); *Descamps v. United States*, 570 U.S. 254, 257 (2013); *Matter of Koat*, 28 I&N Dec. 450, 452 (BIA 2022)). We focus on the elements defining the offense of conviction and the minimum conduct that has a "realistic probability" of being prosecuted under the statute.

A036-826-628

*Id.* (quoting *Moncrieffe v. Holder*, 569 U.S. 184, 191, 206 (2013)). "Elements 'are the constituent parts of a crime's legal definition' that 'the prosecution must prove' and 'what the jury must find beyond a reasonable doubt to convict the defendant.'" *Matter of Dikhtyar*, 28 I&N Dec. 214, 217 (BIA 2021) (citations omitted). Under the categorical approach, "if the elements of the [respondent's] crime are narrower than the elements of the [generic] federal offense, then the [respondent's] crime is a categorical match and every conviction under that statute qualifies as an aggravated felony." *Matter of Delgado*, 27 I&N Dec. 100, 101 (BIA 2017) (citation omitted). A crime "is not a categorical match with a generic federal offense if its elements are broader than those of the generic offense." *Matter of C. Morgan*, 28 I&N Dec. at 510 (citing *Mathis*, 579 U.S. at 500, 509). "However, if the respondent's . . . statute of conviction is categorically overbroad, we must consider whether it is divisible—that is, whether it 'sets out one or more elements of the offense in the alternative.'" *Matter of Dikhtyar*, 28 I&N Dec. at 214, 215 (quoting *Descamps*, 570 U.S. at 257). Only if the statute is divisible may we apply the modified categorical approach, in which we look to the record of conviction to determine "what crime, with what elements, [a respondent] was convicted of." *Mathis*, 579 U.S. at 506. Whether the respondent's crime is categorically a removable offense is a question of law that we review de novo. 8 C.F.R. § 1003.1(d)(3)(ii).

"Generic theft under section 101(a)(43)(G) of the INA, 8 U.S.C. § 1101(a)(43)(G) is defined as the taking of property or an exercise of control over property *without consent* with the criminal intent to deprive the owner of rights and benefits of ownership, even if such deprivation is less than total or permanent." *Matter of Delgado*, 27 I&N Dec. at 101 (citations omitted) (emphasis in the original). We have previously held that an offense that "involves the taking or acquisition of property with consent that has been fraudulently obtained" does not satisfy the generic definition of an aggravated felony theft offense. *Matter of Garcia-Madruga*, 24 I&N Dec. 436, 440 (BIA 2008). The respondent's statute of conviction provides

> **a. Robbery defined.** A person is guilty of robbery if, in the course of committing a theft, he:
>
> (1) Inflicts bodily injury or uses force upon another; or
>
> (2) Threatens another with or purposely puts him in fear of immediate bodily injury; or
>
> (3) Commits or threatens immediately to commit any crime of the first or second degree.
>
> An act shall be deemed to be included in the phrase "in the course of committing a theft" if it occurs in an attempt to commit theft or in immediate flight after the attempt or commission.
>
> **b. Grading.** Robbery is a crime of the second degree, except that it is a crime of the first degree if in the course of committing the theft the actor attempts to kill

A036-826-628

anyone, or purposely inflicts or attempts to inflict serious bodily injury, or is armed with, or uses or threatens the immediate use of a deadly weapon.

N.J Stat. § 2C:15-1. The New Jersey Criminal Code contains multiple sections which provide alternative definitions of "theft." *See* N.J. Stat. §§ 2C:20-2.3; 2C:20-3; 2C:20-4; 2C:20-5; 2C:20- 6; 2C:20-7; 2C:20-8; 2C:20-9. The respondent argues that his statute of conviction is categorically overbroad because a defendant can be convicted for robbery if he committed a proscribed act in the course of committing theft by deception (Respondent's Br. at 5). *See* N.J. Stat. § 2C:20-4 (criminalizing theft by deception). We disagree.

The Supreme Court of New Jersey has explained that "[c]ommitting or attempting to commit a theft is a necessary element of the crime of robbery." *State v. Whitaker*, 983 A.2d 181, 191 (N.J. 2009). In the context of robbery, a person commits theft if he "if he unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof." *Id.* (quoting N.J. Stat. § 2C:20-3(a)). A theft becomes a robbery if a defendant carries out "threats or violence . . . in furtherance of the intent to commit a theft." *Id.* at 192 (quoting *State v. Lopez*, 900 A.2d 779, 785 (N.J. 2006)); *see also State v. Talley*, 466 A.2d 78, 82 (N.J. 1983) ("Robbery is an unlawful taking by force."). Consistent with *Whitaker*, the New Jersey model jury instructions for first-degree robbery rely on section 2C:20-3 to define theft as "the unlawful taking, or exercise of unlawful control over property of another with purpose to deprive him/her thereof." N.J. Model Crim. Jury Instructions., at 2 & n.8.[1] *See State v. R.B.*, 873 A.2d 511, 522 (N.J. 2005) (explaining that the model jury instructions "should be followed" given that the "process by which model jury charges are adopted in this State is comprehensive and thorough"); *State v. Watson*, 277 A.3d 39, 114 (N.J. Super. Ct. App. Div. 2022) (explaining that "a jury charge is presumed to be proper when it tracks the model jury charge verbatim") (citing *R.B.*). The Supreme Court of New Jersey has also held that robbery is a different offense than theft by deception under section 2C:20-4 and theft of services under section 2C:20-8 "not simply in degree but in kind." *State v. Smith*, 642 A.2d 978, 980 (N.J. 1994); *see also State v. Freeman*, 735 A.2d 1195, 1198 (1999) (explaining that an admission by a defendant that he engaged in theft by deception was a "defense to armed robbery") (citing *Talley*, 466 A.2d at 78).

The construction of the robbery statute by the Supreme Court of New Jersey and the authoritative model jury instructions make clear that theft by unlawful taking or exercising unlawful control over property as defined by section 2C:20-3(a) is the only type of theft than can form the basis of a robbery conviction under section 2C:15-1. Because theft under section 2C:20-3(a) falls within the generic definition of theft, we conclude that the respondent's robbery conviction is a categorical aggravated felony theft offense as defined by section 101(a)(43)(G) of the INA, 8 U.S.C. § 1101(a)(43)(G). He is therefore removable under section 237(a)(2)(A)(iii) of INA, 8 U.S.C. § 1227(a)(2)(A)(iii), as a noncitizen convicted of an aggravated felony.

Even if New Jersey caselaw and jury instructions did not clarify the scope of the state's robbery statute, the lack of an express definition for "theft" in the statute's text would make 2C:15-1 "a

---

[1] The jury instructions are available online at https://www.njcourts.gov/sites/default/files/charges/robbery1.pdf?cb=5b9183a5.

A036-826-628

statute [of] indeterminate reach, and where minimum conduct analysis invites improbable hypotheticals." *Hylton v. Sessions*, 897 F.3d 57, 63 (2d Cir. 2018) (citing *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007)). Indeed, we could use our "legal imagination" to "conjure up scenarios that lurk in the indeterminacy" of the word "theft" in section 2C:15-1. *Id.* For instance, it may be theoretically possible for someone to use force "in immediate flight after the attempt or commission" of a theft by deception. N.J. Stat. § 2C:15-1. However, such a scenario is highly improbable. There is no logical hypothetical situation in which a perpetrator could, or would need to, use force "in furtherance of the intent to commit a theft," *Whitaker*, 983 A.2d at 193, after already successfully "obtain[ing] property of another by deception," N.J. Stat. § 2C:20-4; *see also United States v. Hill*, 890 F.3d 51, 56 (2d Cir. 2018) ("[T]he categorical approach must be grounded in reality, logic, and precedent, not flights of fancy."), *abrogated on other grounds by United States v. Davis*, 588 U.S. 445 (2019). Further, if a perpetrator used force while attempting to commit a theft by deception, the use of force would necessarily convert the attempted theft to an attempted nonconsensual theft by taking. *See Matter of Ibarra*, 26 I&N Dec. 809, 811 (BIA 2016) (holding that a theft accomplished by "force, fear, or threats" is a nonconsensual taking).

Because, in the absence of the clarifying New Jersey authority noted above, section 2C:15-1 would have an indeterminate reach, we would then apply the "realistic probability" test to assess whether New Jersey has "in fact applied its law more broadly" to situations that would not satisfy the generic definition of theft. *Williams v. Barr*, 960 F.3d 68, 77 (2d Cir. 2020). Under the realistic probability test, we look to the respondent's "own case or other cases in which the state courts in fact did apply the statute in the special (nongeneric) manner for which he argues." *Id.* (quoting *Duenas-Alvarez*, 549 U.S. at 193). The respondent has not identified any cases in which a defendant was prosecuted for robbery when then underlying theft was anything other than a theft by unlawful taking or unlawfully exercising control of another's property, and our own research has uncovered none. *See, e.g.*, *State v. Maloney*, 77 A.3d 1147, 1150-51 (N.J. 2013) (perpetrators took money from a couple at their home while threatening them with weapons); *Smith*, 642 A.2d 979 (defendant took money from taxi driver after threatening him with a knife); *State v. Zembreski*, 138 A.3d 583, 596 (N.J. Super. Ct. App. Div. 2016) (defendant attempted to take money from victim in his hotel room by putting him in fear of immediate bodily injury); *State v. Chapland*, 901 A.2d 351, 352-53 (N.J. 2006) (defendant took a woman's purse after threatening to cut her with a knife); *State v. Rountree*, 906 A.2d 1124, 197 (N.J. Super. Ct. App. 2006) (defendant took a woman's purse after threatening to shoot her and displaying a gun). We therefore conclude that there is no realistic probability that New Jersey would prosecute someone for first-degree robbery when the underlying theft is accomplished by consent obtained through deception.

Accordingly, the following order will be entered.

ORDER: The appeal is dismissed.

# Exhibit K

# PUBLIC DOCKET FOR

# United States Court of Appeals for the Second Circuit

| | |
|---|---|
| **Court of Appeals Docket #:** 24-3309 | **Docketed:** 12/20/2024 |
| **Case Name:** Mena v. Garland | **Status:** Open |
| **Nature of Suit:** | |
| **Appeal From:** Board of Immigration Appeals | |
| **Fee Status:** IFP Pending in USCA | |

**Case Type Information**

1. Agency

2. Immigration

3.

**Originating Court Information**

**Agency:** BIA: A036-826-628

**Date Rec'd COA:** 12/20/2024

**Date Order Judgment:** 12/13/2024

**Associated Cases**

**Party and Attorney Listing**

TULIO RAFAEL MENA
A036-826-628,
Petitioner

Tulio Rafael Mena
[Pro Se]
Buffalo Federal Detention Facility
4250 Federal Drive
Batavia, NY 14020

MERRICK B. GARLAND, UNITED STATES
ATTORNEY GENERAL
Respondent

Lisa Marie Arnold, Senior Litigation Counsel
[Government]
United States Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

Oil Oil, -
[Government]
United States Department of Justice
Civil Division, Office of Immigration Litigation

P.O. Box 878, Ben Franklin Station
Washington, DC 20044

| Docket | | | LEGEND:<br>(R) - Restricted Document<br>(L) - Locked Document |
|---|---|---|---|
| **Date Filed** | **Entry #** | | **Public Docket Text** |
| 12/20/2024 | 1 | (R) | PETITION FOR REVIEW OF AGENCY ORDER, on behalf of Petitioner Tulio Rafael Mena, FILED. [Entered: 12/20/2024 03:35 PM] |
| 12/20/2024 | 2 | (R) | AGENCY DECISION AND ORDER, dated 12/13/2024, RECEIVED. [Entered: 12/20/2024 03:35 PM] |
| 12/20/2024 | 3 | (R) | MOTION, to proceed in forma pauperis, on behalf of Petitioner Tulio Rafael Mena, FILED. Service date 12/19/2024 by United States Mail. [Entered: 12/20/2024 03:45 PM] [Edited: 12/20/2024 03:48 PM] |
| 12/20/2024 | 4 | (R) | MOTION, for stay of removal, on behalf of Petitioner Tulio Rafael Mena, FILED. Service date 12/19/2024 by United States Mail. [Entered: 12/20/2024 03:48 PM] |
| 12/20/2024 | 5 | (R) | PETITION FOR REVIEW OF AGENCY ORDER, on behalf of Petitioner Tulio Rafael Mena, OPENED. [Entered: 12/20/2024 03:53 PM] |
| 12/20/2024 | 6 | (R) | PETITION FOR REVIEW OF AGENCY ORDER, SERVED. [Entered: 12/20/2024 04:04 PM] |
| 12/23/2024 | 7 | (R) | INSTRUCTIONAL FORMS, to Pro Se litigant, SENT. [Entered: 12/23/2024 08:25 AM] |

*Docket as of 12/23/2024 8:34 AM*

# Exhibit L

  

 

July 9, 2024

Shoba Sivaprasad Wadhia
Office for Civil Rights and Civil Liberties
U.S. Department of Homeland Security Compliance Branch, Mail Stop 0190 2707
Martin Luther King, Jr. Ave., SE
Washington, DC 20528-0190
CRCLCompliance@hq.dhs.gov

Office of Inspector General
U.S. Department of Homeland Security
DHS Office of Inspector General, Mail Stop 0305
245 Murray Lane SW
Washington, DC 20528-0305
dhs-oig.officepublicaffairs@oig.dhs.gov

Office of the Immigration Detention Ombudsman (OIDO)
Mail Stop 0134
Department of Homeland Security
Washington DC 20528-0134
David.Gersten@hq.dhs.gov

Thomas Brophy
Buffalo Field Office Director
ICE Buffalo Field Office
250 Delaware Avenue, Floor 7
Buffalo, NY 14202
Thomas.P.Brophy@ice.dhs.gov
Peter.N.Sukmanowski@ice.dhs.gov

**RE:     Violation of First Amendment Rights of People Engaged in a Hunger Strike at the Buffalo Federal Detention Facility**

> *I want people to understand that without the free calls we are not able to communicate with our families because many of us are poor. We do not have money to pay and we went on a hunger strike to protest the lack of free calls and lock-in and I and others were punished for exercising our right to hunger strike.[1]*

> *One of the people who was engaged in the hunger strike was forcibly removed from our unit in a device that looked like a straitjacket. He did not do anything when officers used force against him. He was just trying to verbally explain why we went on a hunger strike and in response he was physically removed from the unit. We have not seen him since June 7, 2024.[2]*

Dear Officer for Civil Rights and Civil Liberties Wadhia, Inspector General Cuffari, Ombudsman Gersten, and Field Office Director Brophy:

Robert F. Kennedy Human Rights ("RFK Human Rights"), Prisoners' Legal Services of New York ("PLS"), the New York Civil Liberties Union ("NYCLU"), the Center for Constitutional Rights ("CCR"), and Justice for Migrant Families ("JFMF") submit this complaint to the Office for Civil Rights and Civil Liberties ("CRCL") on behalf of people detained at the Buffalo Federal Detention Facility ("BFDF") in Batavia, New York. It details civil rights and civil liberties issues related to abuse of authority/misuse of official position; conditions of detention; due process; excessive or inappropriate use of force; violations of the First Amendment related to free speech and the Fourth Amendment related to unreasonable seizure; and retaliation. The complaint raises important civil rights concerns, details a pattern of civil rights and civil liberties abuses at BFDF, and is an example of a particularly concerning or egregious use of retaliation against peaceful speech by detained people.

On June 7, 2024, approximately 40 people detained at BFDF engaged in their First Amendment-protected right to hunger strike in protest the discontinuance of free phone calls to family and the policy and practice of indiscriminately locking people detained in Unit A-1 in their cells for approximately 18 hours per day.

In response, ICE retaliated against hunger-striking people with threats and use of force against the strikers; placement in solitary confinement; and denial of access to their jobs, recreational activities, and the law library. As one person said:

> *I began to eat after the officer told me that if we do not eat for dinner, I and others would be taken to solitary, we would lose our job, and we would remain in solitary. So I began to eat because was afraid. I also speak English and Spanish, and the officer told me to tell what he told me to the people who only speak in Spanish. I*

---

[1] Interview with Detained Person at Buffalo Federal Detention Facility ("BFDF"), June 2024. Witness statements are anonymized to protect detained people from retaliation by ICE.
[2] Interview with Detained Person at BFDF, June 2024.

*only do the job because I do not want to be locked in my cell for 17 to 18 to 19 hours a day. I feel like I am forced to work for a dollar a day just to be free.*[3]

All human beings in detention are protected by the U.S. Constitution, regardless of whether they are being held on criminal or civil grounds.[4] Retaliation by ICE officials at BFDF for the hunger strike violated the hunger strikers' constitutional rights under the First Amendment.

BFDF has a well-documented history of retaliating against those who engage in their right to free speech through filing grievances, hunger striking, and otherwise peacefully asserting their rights. This pattern of civil rights and civil liberties abuses at BFDF was previously acknowledged by CRCL in June 2023, when it opened a multidisciplinary onsite investigation into the facility, citing concerns over:

> unhygienic living conditions; lack of confidentiality with legal mail; barriers to completing legal paperwork; inadequate language access (particularly for legal access); unsafe volunteer work program practices; dental delays; inadequate telephone services; and *problematic grievance processes*. Other complaints raise concerns about the food served at [BFDF], as well as inadequate and delayed medical care conditions. In addition, other complaints alleged problems with commissary and phone pricing. Finally, CRCL received allegations [sic] issues related to *retaliation from [BFDF] personnel*, *the use of segregation exacerbating mental health issues*, and failure to provide religious accommodations.[5]

The improper use and overuse of solitary confinement at BFDF is also well documented.[6] Here, as in the past, ICE responded in an abusive and punitive manner when people sought to engage in their right to peacefully hunger strike at BFDF. This pattern of abuse leaves no doubt that punitive confinement at BFDF is the norm, not the exception.

Individuals in immigration detention have the right to freedom from First Amendment retaliation and non-punitive and safe living conditions.[7] Therefore, RFK, PLS, NYCLU, CCR and

---

[3] Interview with Detained Person at BFDF, June 2024.

[4] *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Lynch v. Cannatella*, 810 F.2d 1363, 1374 (5th Cir. 1987) ("[W]hatever due process rights excludable [noncitizens] may be denied by virtue of their status, they are entitled under the due process clauses of the Fifth and Fourteenth Amendments to be free of gross physical abuse at the hands of state or federal officials.").

[5] Memorandum from Dana Salvano-Dunn, Dir., Compliance Branch, Office for Civil Rights and Civil Liberties Memorandum from Office, *Retention Memo: Buffalo (Batavia) Service Processing Center Onsite* 2 (June 7, 2023), https://www.dhs.gov/sites/default/files/2023-08/2023.06.07_CRCL%20Retention%20Memo%20to%20ICE_Buffalo%20Service%20Processing%20Center_Redacted_508.pdf (emphasis added).

[6] *See e.g.* Physicians for Human Rights et al., "*Endless Nightmare*": Torture and Inhuman Treatment in Solitary Confinement in U.S. Immigration Detention* 14, 31 (Feb. 2024), https://phr.org/wp-content/uploads/2024/02/PHR-REPORT-ICE-Solitary-Confinement-2024.pdf (documenting instances of solitary confinement of people for over a year and a half and cruel and degrading treatment of LGBTQ+ individuals while in solitary).

[7] *See Zadvydas v. Davis*, 533 U.S. 678, 694 (2001) (asserting that "punitive measures could not be imposed upon [noncitizens] ordered removed because 'all persons within the territory of the United States are entitled to the protection' of the Constitution" (quoting *Wong Wing v. United States*, 163 U.S. 228, 238 (1896)); *see also Cruz v. Beto*, 405 U.S. 319, 321 (1972) (establishing that people in prison, "like other individuals, have the right to petition

JFMF request that your office, pursuant to its authority under 6 U.S.C. § 345, immediately open a complaint for investigation and at the conclusion of the investigation issue a Recommendation Memo to formally recommend that ICE/BFDF:

1)      Immediately cease the policy and practice of blanket lock-ins for 18 hours;
2)      Immediately reinstate provision of free phone calls to family;
3)      Immediately cease the threat or use of force and threat or use of solitary confinement in retaliation for peaceful hunger strikes by individuals at BFDF.

*We respectfully request a response in writing by July 18, 2024, detailing your agencies' plan of action to remedy the civil and human rights violations described herein.*

## I.  Factual Background

### A.  BFDF's Harmful Blanket Lock-In Policy

For months, people detained in Unit A-1 at BFDF have reported that BFDF has a harmful policy of locking people in their cells for approximately 18 hours per day without giving any individualized reason for their prolonged confinement. Unit A-1 is a general population housing unit with two-person cells. People detained in the unit are typically allowed out of their cells for only about six hours per day, which includes the time allotted for meals and showers. Under the lock-in policy and practice, people are only able to avoid 18-hour cell confinement by taking a job in the "voluntary work program."[8] The "voluntary work program" pays people who are detained a BFDF only a $1.00 a day and so in one week the maximum amount of money that can be earned is $5.00.[9]

The near-constant confinement in Unit A-1 at BFDF is dangerously close to solitary confinement. The well-documented harms of solitary confinement include post-traumatic stress disorder, increased risks of self-harm and suicide, hallucinations, confusion, disrupted sleep, reduced cognitive function, lasting brain damage, and heart palpitations. People can begin to experience the harms of solitary confinement within hours of isolation.

Moreover, the practice of double-celling at BFDF does not ameliorate the harmful effects of isolation. Dr. Craig Haney, a widely regarded expert on solitary confinement, has explained that people isolated in double cells

in some ways . . . have the worst of both worlds: they are 'crowded' in and confined with another person inside a small cell but—and this is the crux of their 'isolation'—simultaneously isolated from the rest of the mainstream prisoner population, deprived of even minimal freedom of movement, prohibited from

---

the Government for redress of grievances"); *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983) (extending constitutional protections available to imprisoned people to civilly-detained people).

[8] Interview with Detained Person at BFDF, June 2024

[9] *Id.*

access to meaningful prison programs, and denied opportunities for any semblance of 'normal' social interaction.[10]

## B. ICE Discontinues Access to Free Phone Calls to Family, a Critical and Necessary Line of Communication for People Detained at BFDF

In the beginning of June 2024, people detained at BFDF received notice from ICE that the program that provided free phone calls to family would end. This program permitted detained people, the majority of whom are indigent, to be able to call their family. Contact with family provided a critical and necessary lifeline for people detained at BFDF because it enabled regular communication. Upon information and belief, the discontinuance of the free phone call program by ICE was a decision that was made by ICE headquarters and implemented by BFDF.

One of the people who engaged in the hunger strike explained:

*The only way to contact is through free phones. It is hard for people to contact family. The phone calls are expensive and the free phone calls allowed contact with family. I am subject to a lock-in policy at BFDF and the only way I can't be locked in is to work for a $1.00 a day, and I only am allowed to work two days so I make two dollars and that would allow me to only have two to three minutes to talk.*[11]

## C. June 2024 Hunger Strike and Retaliation in Response[12]

To protest the lock-in policy and discontinuation of free phone calls to family, on June 7, 2024, approximately 40 people detained at BFDF in Unit A-1 engaged in a hunger strike. That morning, several people in Unit A-1 peacefully decided to not take their breakfast. After breakfast, Lieutenant Ireland, a Batavia Officer, came to the unit and threatened the hunger strikers with solitary confinement and loss of their "jobs" if they continued with the hunger strike. At lunch time, several people continued the hunger strike and declined their lunch.

Following lunch time, Lieutenant Ireland and people who identified themselves as "ICE Officials" came to Unit A-1 together with a group of about six Officers. The ICE Officials advised that they would "look into" the discontinuance of free phone calls and that they could not do anything about the lock-in policy. The ICE Officials made clear that people engaged in a hunger strike should cease to do so because ICE had now responded. At dinner time, some people in Unit A-1 continued to hunger strike and declined their meal.

Following dinner time, approximately 20 officers came into Unit A-1 and yelled that everyone needed to lock in their cells. The officers then went to the cells housing people who declined their dinner. About six or seven officers surrounded the hunger strikers and took them out of their cells. Officers also locked some of the hunger strikers into their cells by themselves as punitive solitary confinement. One of those hunger strikers explained:

---

[10] *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1239 n.64 (M.D. Ala. 2017) (citation omitted).

[11] *Id.*

[12] All factual statements in this section came from interviews with people detained at BFDF in June 2024.

*Twenty officers came to the unit and threatened me and threatened us. Six or seven officers surrounded me and took me and placed me in solitary. I was left in solitary from Friday evening until Saturday evening. I was not permitted out of the solitary cell during that entire period of time.*

Other hunger strikers remained in their cells in Unit A-1 after refusing dinner on June 7, but were locked in their cells in conditions resembling solitary confinement. Some hunger strikers received a written segregation placement order stating that they were placed in segregation for medical purposes. However, these people were not seen by medical staff, casting doubt on the ostensibly non-punitive justification for the segregation.

Officers used unreasonable violence to forcibly remove one person from Unit A-1 for engaging in a hunger strike. This person, detained on the second tier of Unit A-1, was trying to speak with officers about the strike when they reacted by violently removing him from his cell. Approximately five officers—including one lieutenant—forced the person to the ground, put their knees to his neck, and affixed shackles to bind him. Officers then forced this person down the flight of stairs to the first tier while he yelled that he could not breathe. A detained person witnessed the shackled person's head hitting against the railings as officers carried him down the stairs. Officers then placed him in what appeared to be a straitjacket. Another witness reported that he looked "like a burrito."[13] Officers then strapped him to a gurney and took him out of the unit. This person has not been seen by others in Unit A-1 since he was taken away on June 7, 2024.

The people who engaged in hunger striking were not engaged in any actions that would warrant disciplinary action.

## II.    Legal Violations

ICE's blanket lock-in policy in Unit A-1 harms detained people and violates their rights. The conditions in Unit A-1 are so restrictive as to be unquestionably punitive. This violates the Fifth Amendment of the U.S. Constitution.[14] Furthermore, BFDF is violating the 2011 Performance-Based National Detention Standards, 2016 revision ("PBNDS") requirements for out-of-cell time in general population. PBNDS requires facilities to provide people in general population with at least four hours a day, seven days a week, of outdoor recreation. If weather prevents outdoor recreation, facilities are required to provide access to indoor recreational opportunities, preferably with natural light. Facilities are also required to provide daily indoor recreation.

Batavia provides approximately only six hours total out-of-cell time to people in Unit A-1, which includes the time allotted for showering and meals. Moreover, people at Batavia do not have access to the small indoor recreation space every day. This is particularly harmful given the extreme temperatures in Batavia, New York. When temperatures are below freezing and there is snow on the ground, the PBNDS requires that people have access to indoor recreation.

---

[13] *Id.*

[14] *Bell v. Wolfish*, 441 U.S. 520, 537 (1979); *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) ("[T]he pretrial detainee, who has yet to be adjudicated guilty of any crime, may not be subjected to any form of 'punishment.'").

Moreover, ICE's response to the June 2024 hunger strike violated ICE's own policies and infringed on hunger strikers' First Amendment rights. As one individual explained:

> *The entire process was intimidating. We acted in good faith. We have a right to engage in hunger strikes to protest our conditions of confinement and in response I and others were threatened with the loss of our rights to commissary, our right to be part of a work program, and our right to be free from solitary confinement.*[15]

First, under ICE's Use of Force Policy (the "Force Policy"), issued as part of the PBNDS, immediate use of force is only permitted when "a detainee's behavior constitutes a serious and immediate threat to self, staff, another detainee, property, or the security and orderly operation of the facility."[16] Based upon the facts and circumstances of the events that occurred on June 7, 2024—the peaceful hunger strike by a number of individuals in Unit A-1—there can be no dispute that ICE's actions were a violation of this policy. Officers deployed the threat of force and the use of force to retaliate against those individuals in Unit A-1 who were peacefully engaging in a hunger strike. In one case, a man was forcibly removed from the dorm and restrained. This retaliation had its desired effect, causing the hunger strikers to stop the hunger strike out of fear they would be physically harmed, kept in solitary confinement, and lose their $1.00-a-day jobs.

Next, under the PBNDS, punitive solitary confinement in response to a hunger strike is not permissible.[17] ICE's threats or use of solitary confinement in response to hunger striking was punitive in nature. ICE administers several types of solitary confinement including (1) disciplinary segregation[18] and (2) administrative segregation.[19] The Special Management Unit Policy (the "SMU Policy"), issued as part of the PBNDS, governs ICE's use of solitary confinement. The

---

[15] Interview with Detained Person at BFDF, June 2024.

[16] U.S. Immigr. and Customs Enf't, *2.15 Use of Force and Restraints*, Performance-Based National Detention Standards, 206 (Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

[17] Detained individuals participating in hunger strikes may be "isolated for close supervision," and in the event of such isolation, "medical personnel shall monitor the detainee in a single-occupancy observation room, when medically advisable and taking into consideration the detainee's mental health needs." Further, "[m]edical personnel shall document the reasons for placing a detainee in a single occupancy observation room. This decision shall be reviewed every 72 hours." In addition, "the ICE/ERO Field Office Director shall be immediately notified when a detainee is on a hunger strike." PBNDS Standard 4.2, Hunger Strikes, https://www.ice.gov/doclib/detention-standards/2011/4-2.pdf.

[18] *See* ICE Directive No. 11065.1, Review of the Use of Segregation for ICE Detainees (2013), 3.2, https://www.ice.gov/doclib/detention-reform/pdf/segregation_directive.pdf ("Disciplinary segregation is a punitive form of separation from the general population for disciplinary reasons. Disciplinary segregation is authorized only pursuant to the order of a facility disciplinary panel, following a hearing in which the detainee is determined to have committed serious misconduct in violation of a facility rule, and only consistent with the Disciplinary Severity Scale from the applicable ICE detention standards, and only when alternative dispositions would inadequately regulate detainee behavior.").

[19] *See* ICE Directive No. 11065.1, Review of the Use of Segregation for ICE Detainees (2013), 3.1, https://www.ice.gov/doclib/detention-reform/pdf/segregation_directive.pdf ("Administrative segregation is a non-punitive form of separation from the general population for administrative reasons. Administrative segregation is authorized only as necessary to ensure the safety of the detainee, facility staff, and other detainees; the protection of property; or the security or good order of the facility, and therefore should be for the briefest term and under the least restrictive conditions practicable, consistent with the rationale for placement. Generally, detainees in administrative segregation shall receive the same privileges as detainees housed in the general population, consistent with safety and security concerns.").

SMU Policy prohibits the use of punitive solitary confinement except where a detained person has been found at a disciplinary hearing to have committed a serious violation of a facility rule.[20]

Finally, the First Amendment protects people engaging in hunger strikes. "[T]he filing of prison grievances is a constitutionally protected activity."[21] So, too, are "[t]he rights to complain to public officials and to seek administrative and judicial relief."[22] Courts have held that hunger strikes intended to convey a particularized message are protected activity.[23] The recent hunger strike at BFDF was intended to convey a particularized message: a protest of BFDF's lock-in policy and the termination of free phone calls. Moreover, ICE's unlawful conduct in response to the June 2024 hunger strike would have chilled any person of ordinary firmness, and did, in fact, chill the protestors' speech.[24]

**Conclusion**

This complaint is just the latest example of BFDF's well-documented pattern and practice of retaliation in response to detained individuals exercising their right to hunger strike, file grievances and otherwise assert violations of their rights. Put simply, BFDF makes it clear that if anyone who is detained there "complains,"[25] consequences will be suffered. And in this case, BFDF effectively used retaliation to quell protected actions by the people detained there.

This complaint, in addition to the other complaints and unrefuted evidence, warrants an immediate investigation into the June 7, 2024, incident and abuses described herein. Without an investigation, BFDF will have succeeded in effectively silencing detained people exercising their rights.

_**The undersigned organizations look forward to your response in writing regarding the status of this matter by July 18, 2024**_

Respectfully submitted,

---

[20] _See_ U.S. Immigration and Customs Enforcement, 2.12 Special Management Units, Performance-Based National Detention Standards, 177 (Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf
[21] _Davis v. Goord_, 320 F.3d 346, 352–53 (2d Cir. 2003).
[22] _Gagliardi v. Vill. of Pawling_, 18 F.3d 188, 194 (2d Cir. 1994).
[23] _See Brown v. McGinnis_, No. 05-CV-758S, 2012 WL 267638, at *3–4 (W.D.N.Y. Jan. 29, 2012); _Stefanoff v. Hays Cnty._, 154 F.3d 523, 527 (5th Cir. 1998) (per curiam).
[24] _Gill v. Pidlypchak_, 389 F.3d 379 (2d Cir. 2004).
[25] Interview with Detained Person at BFDF, June 2024.

/s/ Sarah T. Gillman
Sarah T. Gillman
Sarah E. Decker
Amanda Klein
**ROBERT F. KENNEDY HUMAN RIGHTS**
88 Pine Street, 8th Floor, Suite 801
New York, NY 10005
Tel.: (646) 289-5593


/s/Amy Belsher
Amy Belsher
/s/ Guadalupe Victoria Aguirre
Guadalupe Victoria Aguirre
**New York Civil Liberties Union**
125 Broad St., Fl. 19
New York, NY 10004
(212)606-3300
abelsher@nyclu.org
laguirre@nyclu.org


/s/Jennifer Connor
Jennifer Connor
Executive Director
**Justice for Migrant Families**
371 Delaware Ave.,
Buffalo, NY 14202
Email: info@jfmfwny.org

/s/ Caitlin J. Sandley
Caitlin J. Sandley
**CENTER FOR CONSTITUTIONAL
RIGHTS**
P.O. Box 486
Birmingham, AL 35201
E: csandley@ccrjustice.org


/s/ Jillian Novak
Jillian Novak
/s/ John H. Peng
John H. Peng
**Prisoners' Legal Services of New York**
14 Lafayette Square, Suite 510
Buffalo, NY 14203
Tel.: 716-844-8266 ext. 1323
Fax: 716-854-1008
Email: jnowak@plsny.org